Gladieux Food Services, Inc., Appellant v. Unemployment Compensation Board of Review of the Commonwealth of Pennsylvania, Appellee. District Lodge 141, International Association of Machinists and Aerospace Workers, Intervening Party Appellee.

Argued May 5, 1976, before President Judge BowMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS and BLATT. Judge KRAMER did not participate.

*Thomas D. MacMullan,* for appellant.

*Sandra S. Christianson,* Assistant Attorney General, with her *Daniel R. Schuckers,* Assistant Attorney General, *Sydney Reuben,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

*Richard Kirschner,* with him *Neal Goldstein,* and *Markowitz & Kirschner,* for intervening appellee.

OPINION BY JUDGE BLATT, November 17, 1976:

Gladieux Food Services, Inc. (Gladieux) has appealed a decision of the Unemployment Compensation Board of Review (Board), dated September 25, 1975, which granted unemployment compensation benefits to David A. Laskey[1] (claimant). The claimant is a member of Teamsters Local 249 (union) which represents the employees at Gladieux's in-flight kitchen facility at the Pittsburgh airport. The collective bargaining agreement between Gladieux and the union expired on April 30, 1974. Prior to the expiration of the contract, the parties had engaged in collective bargaining, but had been unable to agree on new terms and conditions of employment. At or about 10:00 P.M. on April 30, the union members voted not to strike and consequently the appropriate employees then reported for work on the midnight shift on May 1, 1974. The airlines which utilized Gladieux's facility to provide food to the passengers on their flights, however,

---

[1] It appears from the record that the legal determination made here will govern the disposition of all of the employer's employees situated similarly with the claimant.

had notified Gladieux prior to the expiration of the contract that they would cease utilizing Gladieux's facility due to the unsettled labor situation until such time as they could be assured of receiving uninterrupted service.[2] The employees continued to report to work until May 9, 1974, when Gladieux closed its facility for lack of work. The claimant was granted unemployment compensation benefits effective as of that date by the Bureau of Employment Security, that decision was affirmed by the Board, and this appeal followed.

Our scope of review of a decision of the unemployment compensation authorities is to determine whether or not errors of law have been committed, and, absent fraud, whether or not the findings of fact are supported by substantial evidence, leaving questions of credibility and weight of evidence to the Board. *Unemployment Compensation Board of Review v. Tickle,* 19 Pa. Commonwealth Ct. 550, 339 A.2d 864 (1975).

The purpose of our unemployment compensation system is to compensate an individual who has become unemployed through no fault of his own. Section 3 of the Unemployment Compensation Law[3] (Act), 43 P.S.§752. Section 402(d) of the Act, 43 P.S. §802(d) provides, *inter alia,* as follows:

> An employe shall be ineligible for compensation for any week—
>
> . . . .

---

[2] On April 15, 1974, Eastern Airlines notified Gladieux that it would terminate service on April 29, 1974; on April 26, 1974, TWA terminated service effective April 30, 1974; on April 29, 1974, Allegheny Airlines terminated service effective May 2, 1974; and, on April 30, 1974, United Airlines terminated service effective immediately.

[3] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §751 et seq.

> In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . .

When a work stoppage has occurred due to a labor dispute, it is necessary to determine the party whose action constituted the final cause thereof, and to assess responsibility against that party. *Bokoski Unemployment Compensation Case*, 206 Pa. Superior Ct. 96, 211 A.2d 124 (1965). *If fault is attributable to both the employer and the employees, compensation must be denied because the purpose of the unemployment compensation law is to benefit faultless employees. Toma v. Unemployment Compensation Board of Review*, 4 Pa. Commonwealth Ct. 38, 285 A.2d 201 (1971). In *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 444-445, 163 A.2d 91, 93 (1960), our Supreme Court established the sole method under Section 402(d) of the Act for determining the responsibility for a work stoppage as follows:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations?

The Board here made the following crucial findings of fact:

> 6. Prior to the expiration of the current agreement, the union agreed to continue to work under the same terms and conditions of the then current agreement and that *any new agreement would be retroactive to May 1, 1974.*

7. The company refused to agree to the union's offer; *the company was willing to continue to provide work under the same terms and conditions of the then current agreement,* but would not agree to retroactivity. (Emphasis added.)

We believe that the union's "offer" did not constitute a bona fide offer to continue work under the pre-existing terms and conditions of employment because of the demand of retroactive benefits. *See Vrotney, supra; Clark Unemployment Compensation Case,* 209 Pa. Superior Ct. 239, 223 A.2d 909 (1966); *Allman Unemployment Compensation Case,* 187 Pa. Superior Ct. 416, 144 A.2d 852 (1958).

The import of this language [of the *Vrotney* test] is clear. *It is the duty of the employe to offer to continue working for a reasonable time under the same terms and conditions.*

*Clark, supra,* 209 Pa. Superior Ct. at 243, 223 A.2d at 911. (Emphasis added.)

The union's offer did not discharge its duty, and, therefore, the Board's findings require that the responsibility for the work stoppage here be assessed against the union as the party which first refused to maintain the status quo. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968).

The union, however, argues that its membership made the required offer to continue working and maintain the status quo by appearing for work as scheduled after the expiration of the contract and thereby discharged its duty under *Vrotney.* It is true that the employees here never called a strike and that they continued to report for work. It is also true, however, that the flow of work from the airlines into Gladieux's facility ceased as a result of the labor dispute and the failure of the parties to agree to continue working for a reasonable period of time.

In *Lerch Unemployment Compensation Case,* 400 Pa. 446, 163 A.2d 535 (1960), the employer was Hershey Estates and our Supreme Court considered the nature of the employer's business when it determined that the union's offer to continue working under the then existing status quo on a day-to-day basis was not sufficient to meet its obligations under the *Vrotney* test. In *Lerch,* the employer's business consisted mainly of service industries which could not be operated on a day-to-day basis. There, the union's offer was not compatible with Hershey's operations and did not, therefore, constitute a reasonable offer under *Vrotney.*

If the employees' actions in reporting for work here constituted an offer to continue working under the previous terms and conditions of employment, clearly there was no expression as to the time element. And, on view of the nature of Gladieux's business, and pursuant to *Vrotney,* it was necessary for the union to offer to maintain the status quo *for a reasonable period of time.* The failure to make such an offer left them in the position of not having met the requirements of the test established under Section 402(d) of the Act. *See Lerch, supra.*

The union also argues that Gladieux closed its facility on May 9 and thereby rendered its members unemployed. We believe that the threshold determination here is whether or not the requirements of *Vrotney* had been met and, therefore, that the crucial period of time in this case was on or around April 30, 1974.

In the very delicate and sensitive negotiations which are involved in the development of a new collective bargaining agreement to replace one that is nearing its expiration, *all parties must be sincere in their desire to maintain the continued operation of the employer's enterprise.*

*Vrotney, supra,* 400 Pa. at 443-444, 163 A.2d at 93. (Emphasis added.)

It is clear from the record that the union knew that the airlines would stop purchasing their food requirements from Gladieux unless they were guaranteed a reasonable period of *uninterrupted* service. In view of the fact that the airlines using Gladieux's service gave notice of termination of service of four (4) days or less (with one exception of 14 days), it only seems reasonable to conclude that a timely offer by the union to maintain the status quo with, for example, a five-day notice provision, *see Vrotney, supra,* could have caused the airlines to continue to utilize Gladieux's facility while contract negotiations continued, thereby averting a work stoppage. We do not believe that the union's actions here indicated a sincere interest in maintaining the continued operation of Gladieux's facility.

We do not condone Gladieux's actions after May 1 and until May 9 during which time it unilaterally altered the terms and conditions of employment, and we accept as fact that Gladieux shut its doors on May 9 for lack of business from the airlines. In addition, we believe that had the union fulfilled its duty to offer to maintain the status quo for a reasonable period of time and had the airlines then refused to utilize Gladieux's services, any resulting work stoppage due to a lack of work could not be assessed against the employees. In summary, however, we believe that the union here did not fulfill its obligation under *Vrotney* to offer to continue working for a reasonable period of time under the preexisting terms and conditions of employment so as to avert a work stoppage and, therefore, that the employees are not without fault for the resultant work stoppage. The claimant must, therefore, be denied unemployment compensation benefits.

150

## ORDER

AND Now, this 17th day of November, 1976, the order of the Unemployment Compensation Board of Review, dated September 25, 1975, is hereby reversed and unemployment compensation benefits are denied.

---

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I must respectfully disagree with the majority's conclusion that the union was responsible for the work stoppage and in doing so precluded unemployment compensation benefits following the expression in *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960).

The findings of the referee and Board tell us that the labor agreement between Claimant's union and Gladieux Food Services (Employer) was due to expire midnight of April 30, 1974. Prior to the expiration date, the union had agreed to continue to work under the same terms of the existing agreement but demanded that any new agreement would have to be retroactive to May 1, 1974. The company, although agreeing to continue the status quo after April 30, 1974, refused to agree to retroactivity. Prior to April 30, 1974, Employer's customers indicated that because of the uncertainty of delay of orders they would not utilize its services, so Employer notified the union that absent a contract on April 30, 1974, there would be no work. Although no new agreement was reached by midnight April 30, 1974, the union voted to continue to work and, in fact, did so continue to work. Employer then made several unilateral moves during this period of continuing work. In particular, the Board's findings were:

"12. On May 1, 1974, the employer, by letter notified, [sic] the employees that the company would not pay the employee's life insurance disability, medi-

cal $20 per day hospitalization, and Blue Cross and Blue Shield.

"13. On May 5, 1974, the employer reduced the employee's wage from the average hourly wage of $3.56 to $2 per hour.

"14. On May 6, 1974, the employer again reduced the employee's hourly rate from $2 to $1.90 per hour.

"15. On May 8, 1974, the employer eliminated the first shift beginning at approximately 5:00 in the morning and eliminated the starting time of the second shift, and informed the employees that they were to only report for the midnight shift.

"16. On May 8, 1974, the employer set up a wire fence enclosure measuring approximately 20 feet by 30 feet on its premises and when the employees reported for work they were directed into this wire enclosure; the employer believed that this was necessary because of certain incidents of vandalism which had occurred. No arrests were made in connection with the alleged vandalism.

"17. Approximately 120 employees were directed into this enclosure, and were told to sit and wait there. The employees only had wire baskets to sit on in this enclosure.

"18. The employer's decisions of May 1, 1974 to eliminate certain employer payments, of May 5, 1974 to reduce the employees' wages, and of May 6, 1974 to further reduce the employees' wages were unilateral decisions by the employer and the union did not agree to these changes.

"19. On May 9, 1974, the employer, as no income was being received due to the scheduled airlines failure to use their services after April 30, 1974, informed the employees that there was no work available and it was closing its facilities.

"20. The employees were laid off as of May 9, 1974."

This Court has concluded that the union's demand, prior to the expiration of the existing contract, that the new contract was to be retroactive vitiated its offer to maintain the status quo by injecting an element into the continuation agreement which had not been a part of the existing agreement. Had the work stoppage occurred on or before the expiration date of the existing agreement, I would agree with the majority. However, I must instead sustain the referee and the Board in their findings and conclusions that Employer's actions on May 1, 5 and 6 constituted a unilateral change in the status quo and working conditions. The period between May 1 and May 9, 1974, was a period in which the union members had voted to continue to work under the same terms of the then-expired agreement and were, in fact, continuing to work, having apparently abandoned their pre-expiration demand of retroactivity. I would therefore hold that the May 9, 1974 layoffs were, in law, a lockout.

I dissent.