Donald Rhodes, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent; Westinghouse Air Brake Company, Intervenor.

Thaddeus J. Gefert, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent; Westinghouse Air Brake Company, Intervenor.

Albert Guiliano, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent; Westinghouse Air Brake Company, Intervenor.

Lloyd E. Myers, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent; Westinghouse Air Brake Company, Intervenor.

Argued March 1, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS, BLATT and DISALLE.

*James H. Logan,* with him *Berlin, Boas, Isaacson, Logan, Rosenfield & Sharon,* and, of counsel, *Frank J. Donner, Robert Z. Lewis* and *James G. Mauro, Jr.,* for petitioners.

*Joseph E. Madva,* with him *Thorp, Reed & Armstrong,* for intervenor.

OPINION BY JUDGE MENCER, May 4, 1978:

These appeals arise out of claims for unemployment benefits filed by approximately 2400 employees

of Westinghouse Air Brake Company (Company), as a result of their unemployment for the 2 weeks ending November 8 and November 15, 1975. The claims were denied by the Bureau of Employment Security (Bureau). Pursuant to an agreement between the Bureau, the Company, and the United Electrical, Radio and Machine Workers of America, Local 610 (UE), the claims of Donald Rhodes, Albert Guiliano, and Lloyd E. Myers are to be treated as "fairly representative" of the claims of all other Company employees who were members of Local 610. The claim of Thaddeus J. Gefert was regarded by the referee as substantially the same as those of the three representative claimants.

On appeal by the claimants from the Bureau's determination, a referee modified the decision of the Bureau and ruled that claimants were eligible for benefits for November 3 and November 4, 1975. On further appeal by the claimants, the Unemployment Compensation Board of Review (Board) affirmed the decision of the referee and disallowed the appeals. The claimants filed petitions for review and, after consolidation and hearing, we affirm.

A reading of the record discloses a series of events and facts which could fairly be stated as follows:

Westinghouse Air Brake Company operates its Westinghouse Air Brake Division at Wilmerding, Pennsylvania. Its employes at the Wilmerding plant in October 1975 included 2400 production and maintenance employees represented by UE; 350 office, clerical and technical employees represented by the Westinghouse Air Brake Office and Technical Union (WABOTU); 16 plant protection employees represented by the Amalgamated Plant Guard Workers of America; and 450 management, professional and other nonunion employees. The 1972 collective bargaining agreements with both WABOTU and UE were by

their terms to terminate at midnight on Friday, October 31, 1975.

Negotiations for new contracts with both unions were carried on in October 1975, with the result that a settlement was reached between the Company and UE in early afternoon on Friday, October 31, approved by UE's executive board and its stewards later that afternoon and evening, and ratified by the membership on Sunday, November 2, 1975. The memorandum of settlement was executed by the Company and UE on Monday, November 3, 1975. This document extended, as modified, the 1972 agreement between the Company and UE for a term of 3 years, including its no-strike clause. Accordingly, there was no labor dispute as between the Company and UE after October 31, 1975.

Negotiations between the Company and WABOTU, however, were not concluded successfully, breaking off at 7:05 p.m. on Friday, October 31, with the WABOTU negotiating committee indicating that a strike and picketing would commence that evening. Picketing by WABOTU members actually began at 10:35 p.m. that night just prior to the start of the 11:15 p.m. third shift, when 200 UE members were scheduled to report for work. There were only three to five pickets at the Tunnel Gate to the plant, which is 20 to 24 feet wide and is the main pedestrian entrance to the plant, crossing under the Penn Central railroad tracks into the plant from the south side of Wilmerding. There are two other principal gates at the eastern and western extremities of the plant, known as the East and West Gates, which are used primarily by vehicular traffic, with parking facilities available to employees on the plant premises. UE members may use all three entrances to enter and leave the plant but use mostly the Tunnel Gate for pedestrian entry and the West Gate if they drive to work and park on plant

premises. The East and West Gates were also picketed beginning at 10:30 p.m. on the Friday in question.

Of the 200 UE members scheduled to report for the third shift that Friday night, October 31, only 45 crossed the WABOTU picket line through the Tunnel Gate and entered the plant, with the balance of the 200 declining to do so, apparently out of reluctance to cross over the picket line. The 45 who entered, moreover, did little or no work, and, despite entreaties by UE officials who entered the plant to persuade them to work and complete their shifts, they left the plant at midnight.

The WABOTU strike continued thereafter for a period of 2 weeks and ended with the ratification of a new agreement on Saturday, November 15, 1975, the plant resuming full production on Monday, November 17, 1975. The claim weeks involved in this case are, therefore, the 2 consecutive weeks beginning Monday, November 3, 1975, and the claimants are all members of UE. During the claim weeks involved, the plant and its gates were kept open for work, work was available at all times for the claimants and other personnel, the four furnaces in the foundry were operating until Thursday, November 6, with two of them operating and the other two placed on a standby basis thereafter, the plant was in operable condition, and no one was laid off.

During the first weekend of the strike, Saturday and Sunday, November 1 and 2, picketing by WABOTU at the three plant entrances was limited and peaceful; and the three or four heat men per shift, members of UE, who were the only employees scheduled to work that weekend, reported to work and worked without incident. Their function was to tend the foundry furnaces.

On Monday, November 3, 1975, WABOTU pickets engaged in massed picketing at all three plant en-

trances, with 40 to 50 pickets stationed in front of each gate. In addition, each of the three gates had been barricaded. The Tunnel Gate was barricaded by benches stretched across its entrance, as well as by barrels. The East Gate was barricaded by railroad ties placed across the driveway entrance and was also blocked with an automobile parked in the driveway. The West Gate was barricaded with 4- by 4-foot timbers as well as barrels. The pickets bore signs stating that WABOTU was on strike and requesting UE to honor its picket lines.

As a result of the massed picketing, none of the Company's employees entered the plant that Monday, with the exception of the 16 plant guards, 7 maintenance heat men, and 1 apprentice, a member of UE, all of whom entered the plant without any difficulty. There were, however, some 60 management personnel also in the plant who had remained overnight from Sunday. The furnaces had been charged that Sunday night with the expectation that the UE production and maintenance employes would report for work on Monday morning. There were 1698 UE members who would normally report for the 7:15 a.m. day shift on Monday, including the claimants, and although about 1000 of them were in the area of the Tunnel entrance that day, none of them entered the plant. Although there was mass picketing on Monday, November 3, the picketing was otherwise peaceful and nonbelligerent, and there was no violence, physical threats, fights, misconduct, damaged cars, arrests, broken windows, or anything of a related nature.

As a result of the mass picketing and the blocking of the entrances, the Company applied for injunctive relief to the Allegheny County Court of Common Pleas on Monday, November 3, with the hearing on the complaint being scheduled for Wednesday, November 5. Meanwhile on Tuesday, November 4, the

number of WABOTU pickets at the gates diminished, there being only 15 to 20 pickets at the East Gate, and since picketing was carried on in a peaceful and orderly fashion, some 150 management, nonunion, and supervisory personnel who reported for work were able to enter the plant without incident. The only UE members who entered the plant that day were 10 maintenance or heat men and 1 apprentice.

On Wednesday, November 5, WABOTU removed all of the barricades from the entrances to the three gates at 4 a.m., more than 3 hours prior to the start of the day shift at 7:15 a.m. There were only about 10 to 15 pickets at the East Gate, and the Company's full force of some 200 professional employes entered the plant that day in addition to its management, supervisory, and nonunion employees, all without incident. There were only about 8 to 10 pickets at the Tunnel Gate.

On Wednesday afternoon, November 5, following the conclusion of the injunction hearing, Judge John P. HESTER of the Allegheny County Court of Common Pleas announced from the bench that he would issue a preliminary injunction against WABOTU and its officers the next day. The decree was in fact issued by Judge HESTER the next day, Thursday, November 6. It enjoined the defendant WABOTU, its officers and its members, from mass picketing, from physically blocking the plant entrances, and from obstructing egress or ingress to the plant. It further limited the number of pickets to six at each of the Tunnel and East Gates, and to five in each of the two driveways comprising the West Gate, with the pickets to be in motion at all times and spaced not less than 6 feet apart. The decree was served that Thursday afternoon upon WABOTU and its officers. It was also served upon the pickets and posted at each gate about 6 a.m. on Friday, November 7. Accordingly, from

Thursday, November 6 on and through the balance of the 2-week period involved, the picketing in both numbers and conduct was in compliance with the terms of the injunction decree. The picketing at all times was peaceful and orderly and there were no threats, misconduct or violence, or anything of that nature at the picket lines.

Section 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(d), provides:

> An employe shall be ineligible for compensation for any week—
>
> . . . .
>
> (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

The claimants bore the burden of proving their eligibility. *Kanouse v. Unemployment Compensation Board of Review,* 9 Pa. Commonwealth Ct. 188, 305 A.2d 782 (1973). Since a labor dispute was in prog-

ress, the rule required the instant claimants to prove by the preponderance of evidence that their stoppage or cessation of work was a result of causes other than their or their union's participation in the dispute.

Our scope of review in unemployment cases is confined to questions of law and, absent fraud, to a determination as to whether the Board's findings (in this case, the referee's findings adopted by the Board) are supported by the evidence. Questions of credibility and the weight to be given evidence are for the Board. *Unemployment Compensation Board of Review v. Tickle*, 19 Pa. Commonwealth Ct. 550, 339 A.2d 864 (1975).

The claimants raise a single issue in their appeals to this Court; namely, whether the determination of the claimants' ineligibility was supported by substantial evidence and was in accord with the governing law.

In *Unemployment Compensation Board of Review v. Tickle, supra,* we stated what is also applicable here:

We believe section 402(d) is clear on its face. All persons who are unemployed due to labor disputes are declared ineligible for benefits unless they can show that they meet the three conditions set forth in the proviso to section 402(d). Thus, in order to avoid being disqualified by section 402(d) of the Act, the claimants in the instant case had the burden of proving (1) that they did not participate in or become directly interested in the labor dispute; (2) that they were not members of an organization which participated in, or was directly interested in, the labor dispute; and (3) that they did not belong to the same grade or class of workers which participated in, or was directly interested in, the labor dispute. . . .

Our reading of the record in this case makes it clear that the claimants succeeded in showing that they meet the last two conditions set forth in the proviso to section 402(d) of the Act. It is clear that claimants were not members of the striking union and that they were not in the same grade or class of workers as the strikers. Therefore, the sole issue remaining in this case is the question of whether the claimants sustained their burden of showing that they meet the first condition set forth in the proviso to section 402(d), *i.e.* that they did not participate in or become directly interested in the strike. If the claimants voluntarily chose to honor a peaceful picket line, then they participated in and became directly interested in the strike, and are not eligible for benefits under section 402(d). If, on the other hand, a reasonable fear of violence caused the claimants not to cross the picket line, then they did not participate in or become directly interested in the strike, and they are eligible for benefits. (Citations omitted, footnote omitted.)

19 Pa. Commonwealth Ct. at 560-62, 339 A.2d at 869-70.

In *Unemployment Compensation Board of Review v. G. C. Murphy Co.*, 19 Pa. Commonwealth Ct. 572, 339 A.2d 167 (1975), after an extensive review of relevant cases, Judge ROGERS set forth for this Court the following standards:

While it seems to us that these cases comprehensively state the rules to be applied and provide sufficient examples for testing new matters, the Board complains that the law is not clear as to what actions by strikers or their partisans are sufficient to cause a non-striker's fear of injury to be substantial and real

and not nebulous or fanciful. Our reading of the cases and our consideration of the subject generally leads us to the following conclusions: (1) That mere rumors that violence will occur are not justification for refusal to cross peaceful picket lines to report for available work; (2) that the fact that in past strikes violence has occurred is not justification for refusal to cross peaceful picket lines; (3) that the violence necessary to justify a refusal to cross picket lines must, in the ordinary case, be violence at the picket lines at the employer's premises and have for its purpose, or its effect must be, to prevent the claimants from entering or leaving the employer's premises in the pursuit of their usual employment; (4) that threats of violence in the ordinary case must, in order to justify a refusal to cross picket lines similarly occur at the employer's premises, have the purpose and effect of preventing the claimants from working and must in addition be accompanied by a show of force at the picket lines sufficient to instill in a reasonable person a genuine fear for his personal safety; (5) that one occasion of violence or threats of violence accompanied by a show of force, followed by an extended period of peaceful picketing, will not justify a continued refusal to cross picket lines in the absence of evidence that the unlawful activity will probably be resumed in the event of future attempts to cross picket lines, and that law enforcement agencies are unable or unwilling to maintain order and protect persons lawfully seeking to continue their employment; (6) that a claimant who refuses to cross picket lines does not carry his burden of proving eligibility

for unemployment compensation by expressions of fear for his personal safety without proof of violence or threats of violence as described in (3) and (4) or proof of an occasion of violence, the likelihood of its reoccurrence and the inability or unwillingness of law enforcement agencies to maintain order; and (7) that the absence of evidence of any effort by claimants to cross peaceful picket lines, although not itself disqualifying, casts doubt on their claim for eligibility. Obviously the law can and will, despite general statements of rules, provide relief in exceptional cases. Hence, in the class of case under consideration, violence away from the picket line could conceivably be so extreme and so clearly threatening as to justify a refusal to cross a peaceful picket line. Further, expressions by law enforcement agencies of willingness to maintain order, belied by experience and the circumstances, could be found to be insufficient grounds for disqualifying a worker refusing to cross a picket line after a violent incident followed by peaceful picketing. 19 Pa. Commonwealth Ct. at 582-83, 339 A.2d at 173-74.

We now must consider the facts of the instant case, as found by the referee and adopted by the Board, against these standards. Concerning November 5, 1975 and the days thereafter, the referee made the following pertinent findings:

29. On November 5, the full force of professional employees reported for work without incident and reduced picketing by WABOTU members was in effect at the pedestrian entrance. Some Local 610 members reported for work on November 5, 1975, and thereafter, and had no problem entering or leaving the plant.

30. Additionally, the number of people congregating in the plaza area outside the pedestrian entrance, was significantly less than on November 3 and November 4, 1975.

31. On November 3, 1975 the Company went into the Court of Common Pleas of Allegheny County, Pennsylvania and requested an injunction against WABOTU and its officers concerning mass picketing, blocking of entrances, coercion, intimidation, etc., and the hearing was held by the Court on November 5, 1975 and the Court announced that it would issue the injunction the next day.

32. Local 610 was aware of the Court proceeding as it had representatives and witnesses in Court.

33. On November 6, 1975 the Court signed an Order and the injunction limited picketing by WABOTU to 6 in number at the East Gate and the pedestrian entrance, and to 5 at the West Gate and further provided that the pickets must be in motion at all times and shall not block the entrances or interfere with ingress or egress by others.

34. Copies of the Order of Court were served on WABOTU officers and pickets on November 6, 1975 and said striking union and its members removed all remaining barricades and, thereafter, complied with the injunction.

35. On November 6, 1975 and November 7, 1975 when the limited number of members of Local 610 who had reported for work were leaving work, there were shouts and hazing from the WABOTU pickets and members and from other Local 610 members who had not reported for work and were standing around in the plaza area.

36. Some officials and stewards of Local 610 had been repeatedly urging their members to report for work but their entreaties were usually to no avail although some Local 610 members did report for work by passing through the picket lines behind their union officials on November 6, 1975.

37. Work was available for Local 610 members and both they and their union were aware of same and the Company had specifically advised the Union leadership of same.

38. All three plant entrances were open during the entire period of the labor dispute (two weeks) and all who reported for work actually worked. There were no layoffs by the Company during the period at issue.

. . . .

43. On November 10, 1975 and thereafter during the second week of the WABOTU strike, approximately 300 employees were reporting for work without any problem being encountered on entering or leaving the plant as WABOTU was in complete compliance with the Court injunction.

44. There were no incidents of violence or threats of same at the picket lines at any time during the labor dispute period and all employees who reported to work did so without any harm, or threats thereof, to their person or property.

. . . .

46. The members of Local 610 who did not report for work were respecting the picket lines of the WABOTU union and their failure to report was not because of fear, threats, acts of violence, or any real or present danger to their person or property.

47. The labor dispute between WABOTU and the Company was settled on November 14, 1975 and a new contract was ratified on Saturday, November 15, 1975.

48. All workers returned to work and regular and full production resumed on Monday, November 17, 1975 and any worker unemployed on and after said date was unemployed due to a reason or reasons unrelated to the labor dispute between the Company and WABOTU.

Our reading of the record convinces us that it contains substantial and competent evidence to support each of these findings. Furthermore, we must agree with the referee's evaluation of these findings which was expressed as follows:

As revealed by the Findings, many workers, union and nonunion, reported for work on Wednesday, November 5, 1975 without significant incident in entering and leaving the plant. Commencing on November 6, 1975 and thereafter a Court injunction was in effect and was complied with by the striking union. The failure of the members of Local 610 to report for available work on and after November 5, 1975 reveals that they remained away from employment voluntarily because they were honoring picket lines established by the other union. . . .

Unless a claimant can show that his reasons for refusing to cross a picket line is based upon actual fear of bodily harm or damage to his property, his failure to report for work is considered voluntary within the meaning of the Unemployment Compensation Law. In the present case, the record does not show that there were any threats or acts of violence on the picket line but merely shows that claimant and his fellow union members desired to remain

away from work out of sympathy for the striking union. The Referee must conclude that in the absence of any evidence of violence, intimidation or physical restraint, that the members of Local 610 on and after November 5, 1975 failed to cross the picket line because they had yielded merely to persuasion of the striking union and, therefore, did not report for work as a result of their own volition.

Therefore, we conclude that the claimants did not carry their burden of proving that their unemployment on and after November 5, 1975 was caused by a genuine fear of physical violence or the threat of violence. Consequently, they were not eligibile for unemployment compensation benefits for the period of November 5, 1975 through November 15, 1975.

Accordingly, we make the following

ORDER

AND Now, this 4th day of May, 1978, the orders of the Unemployment Compensation Board of Review, dated November 17, 1976, disallowing further appeal to Donald Rhodes, Albert Guiliano, Lloyd E. Myers, and Thaddeus J. Gefert are hereby affirmed.