Domenic A. Borello, Jr. et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.
Robert F. Bolsinger et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.
Eneo Panicco et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

354

Argued October 31, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS, DISALLE and CRAIG. Judges BLATT and MACPHAIL did not participate.

*Stanford A. Segal,* with him *Gatz, Cohen, Segal &, Koerner,* for petitioners.

*Michael Klein,* Assistant Attorney General, with him *Robert P. Kane,* Attorney General, for respondent.

OPINION BY JUDGE MENCER, February 8, 1979:

These appeals arise out of claims for unemployment compensation filed by approximately 985 employees of Townsend and Bottum, Inc., as a result of their unemployment during the period of June 1, 1976 to June 22, 1976. The claims were denied by the Bureau of Employment Security (Bureau). On appeal by the claimants from the Bureau's determination, a referee affirmed the decision of the Bureau and, on further appeal by the claimants, the Unemployment Compensation Board of Review (Board) affirmed the decision of the referee and denied benefits. The claimants filed petitions for review and, after consolidation and hearing argument, we affirm.

The claimants seeking review at No. 2171 C.D. 1977 are members of various building and construction craft unions (Craft Workers), those seeking review at No. 2185 C.D. 1977 are members of Millwrights Local 2235 (Millwrights), and those seeking review at No. 2186 C.D. 1977 are members of Iron Workers Local 3 (Iron Workers). These claimants work on construction projects throughout western Pennsylvania, and immedi-

ately before their unemployment that results in the claims here under consideration, they were working on the fossil-fuel construction project at Shippingport, Pennsylvania.

On May 31, 1976, various labor-management agreements expired throughout the construction sector in western Pennsylvania. The Master Builders Association did reach an agreement with the Craft Workers on or before June 1, 1976 but no agreement was entered into between the Millwrights and the Master Builders Association by that date, and no agreement had been reached between the Iron Workers and the Iron Workers Association.

Although the Master Builders Association and the Iron Workers Association were willing to maintain the status quo for work performed on and after June 1, 1976, the firm position of the Millwrights and Iron Workers was that any future agreement would have to contain a provision making any higher wage rate retroactive to June 1, 1976.

On June 1 and June 2 of 1976, the Craft Workers were allowed entry to the job sites and they worked their daily schedules. However, on those two days the Millwrights and the Iron Workers were barred from entering the job sites. On June 3, 1976 and continuing thereafter through June 21, 1976, the Millwrights and Iron Workers established picket lines at the various job sites which were honored by the Craft Workers, resulting in their refusal to cross the picket lines to reach the job sites. The picketing at all times was peaceful and orderly and there were no threats or violence at the picket lines.

Section 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d), provides:

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this sub-section shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

The claimants bore the burden of proving their eligibility. *Kanouse v. Unemployment Compensation Board of Review,* 9 Pa. Commonwealth Ct. 188, 305 A.2d 782 (1973). Since a labor dispute was in progress, the rule required the instant claimant to prove by the preponderance of evidence that their stoppage or cessation of work was a result of causes other than their or their union's participation in the dispute.

Our scope of review in unemployment cases is confined to questions of law and, absent fraud, to a determination as to whether the Board's findings are supported by the evidence. Questions of credibility and the weight to be given evidence are for the Board. *Unemployment Compensation Board of Review v. Tickle,* 19 Pa. Commonwealth Ct. 550, 339 A.2d 864 (1975).

The claimants contend that the employers, in denying the Millwrights and Iron Workers admittance to job sites on June 1 and June 2 of 1976, caused the work stoppage and that the Craft Workers were locked out by the employers. Our examination of the record reveals to us that there is evidence to support such contentions. However, there is conflicting evidence that does support the findings made by the Board. We must be mindful that questions of credibility and the weight to be given evidence are for the Board and that our scope of review is limited.

The following facts, as found by the Board, are crucial to our disposition of the instant cases.

No. 2171 C.D. 1977 (Craft Workers):

10. On the morning of June 1, 1976, claimant, the members of his union, and the employes of all other Building and Craft Unions, except Millwrights Local Union 2235 and Ironworkers Local Union 3, reported for work for their employers at the various new construction sites throughout Western Pennsylvania.

11. The Ironworkers Local 3 and Millwrights Local 2235 members made no sincere effort to report for work on June 1, 1976 but even if they had done so, orders had emanated from Townsend and Bottum, Incorporated that had been issued to the security guards stationed at the various entrances to various job sites, that entry was to be barred to the members of Ironworkers Local 3 and Millwrights Local 2235, but entry was to be permitted to the members of all other craft unions.

12. On June 2, 1976, the situation was the same as existed on June 1, 1976 and all craft union members reported for work at various job sites throughout Western Pennsylvania with

the exception of the members of Ironworkers Local 3 (hereinafter called Local 3) and members of Millwrights Local 2235 (hereinafter called Local 2235).

13. Local 3 and Local 2235 did not establish any picket lines on June 1 and 2, 1976.

14. On the morning of June 3, 1976 and continuing thereafter through June 21, 1976, Local 3 and Local 2235 established picket lines at various construction and other sites in Western Pennsylvania and claimed inter alia that Townsend and Bottum, Incorporated[,] other employers and the employer associations were not bargaining in good faith.

15. Picketing at all times was of a peaceful nature and there were no incidents of any kind that deterred ingress or egress to any construction site by any employe who desired to enter or leave during the period of the labor dispute.

16. Some members of some craft unions had reported for work and had arrived at their job sites the morning of June 3, 1976 prior to the appearance of pickets from Local 3 but, upon learning of the arrival of the Local 3 pickets, left their job sites.

17. On and after June 3, 1976, claimant and the other members of his union and members of the other craft unions did not report for available work during the period of the labor dispute when picket lines were in force.

. . . .

24. The employers did not refuse or prohibit ingress or egress to any job site to any union employe, with the exception of Local 3 and Local 2235 members during the period of the labor dispute.

25. The members of the building and craft unions who did not report for available work during the period of the labor dispute were honoring the picket lines established by the members of Local 3 and Local 2235 and were never, at any time, prevented or denied entry as a result of the picketing of the two unions involved in the labor dispute.

26. The dispute between the employers, the employer associations and Local 3 and Local 2235 was resolved on June 21, 1976 and the picket lines were dissolved at various times on said date and the members of all building and trade unions returned to work on June 22, 1976. No. 2185 C.D. 1977 (Millwrights):

10. The employers and the employers' association were agreeable to enter into tentative agreements that would have allowed the status quo to continue on and after June 1, 1976 while negotiations continued but the firm position of Townsend and Bottum, Incorporated and the employers' association was that there would be no retroactivity as to wages back to June 1, 1976 in case a new agreement was not reached, as to wages, until some point after June 1, 1976.

11. Both Local 3 and Local 2235 had taken the position in negotiations that any new agreement that was not finalized by June 1, 1976 would have to contain a provision making any higher wage rate retroactive to June 1, 1976.

. . . .

13. Ironworkers Local 3 and Millwrights Local 2235 never offered to continue working on and after June 1, 1976 while negotiations continued on the same terms and conditions that existed under the prior contracts that expired at midnight on May 31, 1976.

No. 2186 C.D. 1977 (Iron Workers):

10. The employers and the employer's association were agreeable to enter into tentative agreements that would have alloweed the status quo to continue on and after June 1, 1976 while negotiations continued but the firm position of Townsend and Bottum, Incorporated and the employer's association was that there would be no retroactivity as to wages back to June 1, 1976 in case a new agreement was not reached, as to wages, until some point after June 1, 1976.

11. Both Local 3 and Local 2235 had taken the position in negotiations that any new agreement that was not finalized by June 1, 1976 would have to contain a provision making any higher wage rate retroactive to June 1, 1976.

. . . .

13. Ironworkers Local 3 and Millwrights Local 2235 never offered to continue working on and after June 1, 1976, while negotiations continued, on the same terms and conditions that existed under the prior contracts that expired at midnight on May 31, 1976.

. . . .

15. Townsend and Bottum, Incorporated had advised Ironworkers Local 3 and Millwrights Local 2235 that if no agreement, tentative or otherwise, was reached by June 1, 1976 that it would be unable to establish the wage rates payable to the Ironworkers and Millwrights and that it would therefore not allow the Ironworkers and Millwrights to enter the various construction job sites in Western Pennsylvania.

16. Security guards at the Bruce Mansfield site had been advised that effective with the

morning shift of June 1, 1976 that entry was to be denied to members of Local 3 and Local 2235 but all other building and craft union members were to be permitted entry.

Insofar as the appeal of the Craft Workers is concerned,[1] there is a specific finding, supported by substantial evidence, that picketing at all times was of a peaceful nature and that there were no incidents of any kind that deterred ingress or egress to any construction site by any employe who desired to enter or leave during the period of the labor dispute. This finding makes applicable what we stated in *Unemployment Compensation Board of Review v. Tickle, supra*:

> We believe section 402(d) is clear on its face. All persons who are unemployed due to labor disputes are declared ineligible for benefits unless they can show that they meet the three conditions set forth in the proviso to section 402(d). Thus, in order to avoid being disqualified by section 402(d) of the Act, the claimants in the instant case had the burden of proving (1) that they did not participate in or become directly interested in the labor dispute; (2) that they were not members of an organization which participated in, or was directly interested in, the labor dispute; and (3) that they did not belong to the same grade or class of workers which participated in, or was directly interested in, the labor dispute. . . .
>
> Our reading of the record in this case makes it clear that the claimants succeeded in showing that they meet the last two conditions set forth in the proviso to section 402(d) of the Act. It is clear that claimants were not members of the

---

[1] *See Rhodes v. Unemployment Compensation Board of Review*, 35 Pa. Commonwealth Ct. 198, 386 A.2d 612 (1978).

striking union and that they were not in the same grade or class of workers as the strikers. Therefore, the sole issue remaining in this case is the question of whether the claimants sustained their burden of showing that they meet the first condition set forth in the proviso to section 402(d), *i.e.* that they did not participate in or become directly interested in the strike. If the claimants voluntarily chose to honor a peaceful picket line, then they participated in and became directly interested in the strike, and are not eligible for benefits under section 402 (d). (Citations omitted, footnote omitted.)

19 Pa. Commonwealth Ct. at 560-61, 339 A.2d at 869-70.

Directing our attention now to the claims of the Millwrights and Iron Workers, the record discloses a specific finding, supported by substantial evidence, that the Millwrights and Iron Workers never offered to continue working on and after June 1, 1976, while negotiations continued, on the same terms and conditions that existed under the contracts that expired at midnight on May 31, 1976.

When a work stoppage has occurred due to a labor dispute it is necessary to determine the party whose action constituted the final cause thereof and to assess responsibility against that party. In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444-45, 163 A.2d 91, 93 (1960), our Supreme Court established the sole method under Section 402(d) of the Act for determining the responsibility for a work stoppage as follows:

Have the employees offered to continue working for a reasonable time under the preexisting terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has

the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations?

Because of the demand for retroactive benefits by the Millwrights and Iron Workers, as established by the findings of fact, we must conclude that these claimants did not make a bona fide offer to continue work under the preexisting terms and conditions of employment and therefore the work stoppage here must be assessed against these claimants as the ones which first refused to maintain the status quo. *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968); *Vrotney Unemployment Compensation Case, supra; Clark Unemployment Compensation Case*, 209 Pa. Superior Ct. 239, 223 A.2d 909 (1966).

Therefore, we conclude that the claimants in the instant appeals did not carry their burden of proving their eligibility and consequently they were not eligible for unemployment compensation benefits for the period of June 1, 1976 through June 21, 1976.

Accordingly, we make the following

### Order

And Now, this 8th day of February, 1979, the orders of the Unemployment Compensation Board of Review, dated September 29, 1977, affirming the decision of the referee and denying benefits to the claimants represented in the above captioned appeals, are hereby affirmed.

---

Dissenting Opinion by Judge Craig:

I must respectfully dissent because the facts and the findings in the record, establishing a lockout of all three of the petitioning groups of employees, lead to

the conclusion that the employees are not rendered ineligible for compensation under Section 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* (Law), 43 P.S. §802(d).

There can be no dispute concerning the abstract validity of the judicial doctrine which governs when Section 402(d) of the Law is applicable by reason of a work stoppage "which exists because of a labor dispute (other than a lockout). . . ." Section 402(d), 43 P.S. §802(d). *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444-45, 163 A.2d 91, 93 (1960).

However, as the quoted phrase makes clear, Section 402(d) is not applicable, and we do not reach the question of offers to continue work under pre-existing terms, if the work stoppage exists because of a lockout.

Under the expressed logic of the statute, the threshhold question is whether there is a lockout or a strike. If the work stoppage is because of a lockout, we do not get into Section 402(d).

This analysis was implicit in, and presaged by, the dissenting opinion of Judge CRUMLISH in *Gladieux Food Services, Inc. v. Unemployment Compensation Board of Review,* 27 Pa. Commonwealth Ct. 142, 150, 365 A.2d 889, 893 (1976), where substantial physical obstruction of access by the employer obviated the necessity of considering the acceptability of the union's offer to continue work.

With respect to the Iron Workers and Millwrights there is no dispute, and the Board found, that security guards were instructed to bar them from entry to the job site, and they were excluded from June 1 onward. The threshold question is answered definitively: there was a lockout.

The rationale of the employers was that they had to refuse work to the Iron Workers and Millwrights

because wage rates would be indeterminate and job costs impossible to estimate accurately. Aside from the union claim that the terms of the International Agreement would cause the old rates to continue to be applicable, it is nevertheless clear that, if the Iron Workers and Millwrights had been permitted to continue to work, they would have had no contractual claim for any higher rates during the interim period, unless the employer should subsequently agree to retroactivity.

It must be agreed that an employer who leaves his gates open so that employees may present themselves is entitled to know how steadily their services would be available, at least in the case of industries requiring some assurance of continued services, such as basic steel, for example, or the service industry in *Lerch Unemployment Compensation Case*, 400 Pa. 446, 163 A.2d 535 (1960). Aside from the fact that the construction involved in the present case may not fall in that category, here the question is not reached because the doors were *not* kept open, as was done in a very clear way by the employer in *Lerch*.

With respect to the Craft Workers, the evidence supports a finding of lockout also.

The evidence was that the prime contractor had instructed its subcontractors to shut down on June 1 and requested other prime contractors to do so. Some Craft Workers were excluded by plant security guards on June 3 and others were paid off, outside the job site, on that date. Various witnesses, including a boilermaker, a steamfitter, a laborer, a pile driver, a cement mason, a plumber and others testified of exclusion by security guards and padlocked gates.

Section 402(d) of the Law not being applicable in these circumstances, I would reverse.

Judges CRUMLISH, JR. and DiSALLE join in this dissent.