James W. Wright et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent; Koppers Company, Inc., Intervenor.

Argued May 9, 1979, before President Judge Bowman and Judges Crumlish, Jr., Mencer, Blatt, DiSalle, Craig and MacPhail. Judges Wilkinson, Jr. and Rogers did not participate.

*Stanford A. Segal,* with him *Gatz, Cohen, Segal & Koerner,* for petitioners.

*Templeton Smith,* for intervenor.

Opinion by President Judge Bowman, September 4, 1979:

This petition for review arises out of claims for unemployment compensation filed by forty-eight (48) employees of Koppers Engineering and Construction Company (Koppers) as a result of their unemployment during the period from September 9, 1976 through January 3, 1977, the period during which other Koppers employees, members of the United Steel Workers of America Local 13300 (Steel Workers), maintained a work stoppage in a dispute over negotiation of a new collective bargaining contract.

The Bureau of Employment Security granted the claims for the period from September 9, 1976 through September 14, 1976, because it found that the claimants could not have entered the plant due to mass picketing and material obstruction at the construction gate, but denied benefits for the remainder of the strike because it found that the claimants remained away from available work by honoring the Steel Workers' picket line.

On appeal by the employer the Referee, after hearing, reversed the Bureau as to the September 9 through September 14 period, and declared claimants

ineligible for benefits through the duration of the work stoppage. The Unemployment Compensation Board of Review affirmed the Referee's decision to deny benefits, and claimants have appealed to this Court.

Claimants have been denied benefits pursuant to Section 402(d) of the Unemployment Compensation Law (Law),[1] 43 P.S. §802(d), which declares as ineligible for compensation any employee whose

unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

Claimants are construction workers, and at the time of the Steel Workers' strike were members of various craft unions affiliated with the Butler, Pennsylvania, Building Trades Council. As such, they satisfy criteria (2) and (3) set forth in Section 402(d). The Board of Review found, however, that they did not attempt to cross the Steel Workers' picket line and thereby participated in the labor dispute to an extent

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §751 *et seq.*

sufficient to disqualify them from benefits. The sole question presented by this appeal is therefore directed to whether the work stoppage of these employees was caused by their voluntarily choosing to honor the Steel Workers' picket line or whether, as claimants allege, there were sufficient threats, violence and destruction on the part of the pickets to justify a failure to test the picket line.

The Steel Workers' strike began at midnight, September 9, 1976, and their picket lines appeared the next morning. In anticipation thereof, Koppers made available a special construction gate for the use of construction workers and had in the meantime removed heavy equipment from the plant site as well as locking up hand tools and small power equipment.

Uncontroverted testimony reveals that the construction gate was approximately one hundred and forty-four (144) feet wide and during the course of the work stoppage was manned by anywhere from approximately one-half to one dozen placard-bearing pickets. This was the status of the picket line the construction workers did not cross on September 10, 13 and 14 when they reported to the entrance of the gate.

On September 15, the president of the Butler County Building Trades Council received a request from the employer that all construction workers report for work. Those who did once again found Steel Worker pickets at the construction gate. This time, however, and the pattern was to repeat itself over the ensuing months, glass, nails and cut logs were strewn over the roadway leading to the Koppers plant; a large barrel was placed in the middle of the road; and a telephone pole was laid across the gate entrance. Once again, the construction workers did not attempt to gain entry to the plant.

Plant production started up again on September 30. Koppers contends, and there is nothing in the

testimony to refute it, that at all times prior and subsequent to this date locked-up tools and machinery were readily accessible, and work was available to claimants. Production was maintained through the use of two hundred (200) salaried employees who were provided lodging and other necessities while remaining within the perimeters of the employer's property.

A certain amount of daily travel was maintained through the construction gate by regular management or salaried employees who were able to negotiate the obstructed roadway by either driving on the berm, or, at times at the expense of a flat tire, over the glass and nails. After the 30th, this traffic was facilitated by clean-up crews, deployed periodically by Koppers to pick up the debris scattered on the roadbed. Despite this activity at the construction gate, no deliveries were made to Koppers during the work stoppage. The Referee's findings are clear, however, that this inactivity related to the Koppers plant entrance rather than the construction gate.

It is apparent from the record that after September 30, *i.e.*, after Koppers resumed production, the pickets became more militant. The glass and nails reappeared each evening after the clean-up crews cleared the roadway. Plant windows were broken after nightfall, and the windshield of a plant supplier was smashed. On one occasion a plant manager was threatened.

On October 13, a temporary restraining order was issued which barred mass picketing and limited pickets to six at each of the company entrances, not less than ten (10) feet apart. On October 18, the temporary injunction was dissolved with the stipulation that either side could petition for reinstatement. On October 26, November 1, and November 8, further injunction hearings were held, but no injunction issued.

In the meantime, the Butler County Building Trades Council had requested of Koppers some type of insurance coverage for council members that would pay for either personal or property damage should they try to cross the picket line. Though no testimony appears in the record with regard to any personal violence visited upon any member of the nonstriking construction workers, there is hearsay testimony that their fears were predicated in part upon incidents several years prior thereto of violence within the context of construction workers crossing a Steel Workers' picket line. Koppers denied the request for insurance.

The work stoppage ended on January 3, 1977, and the construction workers returned to work on January 4. At no time during the strike had they attempted to cross the picket line.

Koppers argues that claimants were directly interested in the Steel Workers' strike as evidenced by their refusal to cross the picket line. Claimants counter that they fall within that class of eligibility defined by us in *Unemployment Compensation Board of Review v. G. C. Murphy Co.*, 19 Pa. Commonwealth Ct. 572, 578, 339 A.2d 167, 171 (1975):

> [W]orkers not participating in a labor dispute who refuse to cross a picket line due to a reasonable and genuine fear of physical injury inspired by actual or threatened violence are eligible for unemployment compensation.

All parties readily agree that this case presents a factual situation falling somewhere between that in *Unemployment Compensation Board of Review v. Tickle*, 19 Pa. Commonwealth Ct. 550, 339 A.2d 864 (1975), and *Murphy, supra*. In *Tickle* we awarded unemployment benefits to claimants who did not cross a menacing picket line despite the absence of actual violence, because "[w]e believe . . . a showing of threats

of violence together with a show of force on the picket line, sufficient to induce a reasonable fear of violence, is enough to prove that the failure to cross was involuntary.'' *Id.* at 563, 339 A.2d at 871. In *Murphy* we denied benefits to claimants who refused to cross peaceful picket lines based on "no more than an unspoken threat . . . unaccompanied by a show of force. . . .'' *Id.* at 584, 339 A.2d at 174.

The nightly vandalism and obstruction of the roadway, the smashed windshield, the failure to receive insurance from the employer or assurance from the Steel Workers are all relied upon by claimants, together with the spectre of violence incident to a prior strike, as justification for their refusal to cross the picket line. The evidence of actual property damage as well as the real possibility of physical violence combine, they argue, to bring this case within the rule of *Tickle.*

Koppers, on the other hand, argues that the record is devoid of evidence of any real violence on the picket line save for isolated instances of nighttime damage to the plant, and that claimants have thereby failed to meet their burden of proving by a preponderance of evidence that their failure to cross picket lines was a result of causes other than their, or their union's, participation in the dispute. *See Kanouse v. Unemployment Compensation Board of Review,* 9 Pa. Commonwealth Ct. 188, 305 A.2d 782 (1973).

We have given the record exacting scrutiny and conclude that claimants have not sustained their burden of proving that their unemployment was caused by a genuine fear of physical violence or the threat of violence, and, if the *Murphy—Tickle* dichotomy must be distinguished, that the facts of this case are more akin to *Murphy,* particularly the following:

Our reading of the cases and our consideration of the subject generally leads us to the follow-

ing conclusions: . . . (2) that the fact that in past strikes violence has occurred is not justification for refusal to cross peaceful picket lines; (3) that the violence necessary to justify a refusal to cross picket lines must, in the ordinary case, be violence at the picket lines at the employer's premises and have for its purpose, or its effect must be, to prevent the claimants from entering or leaving the employer's premises in the pursuit of their usual employment; (4) that threats of violence in the ordinary case must, in order to justify a refusal to cross picket lines similarly occur at the employer's premises, [and] have the purpose and effect of preventing the claimants from working . . . ; (5) that one occasion of violence or threats of violence accompanied by a show of force, followed by an extended period of peaceful picketing, will not justify a continued refusal to cross picket lines . . . ; and (7) that the absence of evidence of any effort by claimants to cross peaceful picket lines, although not in itself disqualifying, casts doubt on their claim for eligibility.

*Id.* at 582-83, 339 A.2d at 173-74. Both the Referee and the Board found, with the support of substantial evidence in the record, that, save for the isolated incident involving the broken windshield, all property damage and all violence occurred during the hours of darkness and could not be attested to by eyewitnesses; in other words, that the picket line facing the construction workers each morning was essentially a peaceful one. We are of the opinion that the obstruction on the roadbed, *i.e.*, glass and nails, and at the construction gate entrance, *i.e.*, the occasional barrel or telephone pole, does not raise to the level of violence or threat thereof, defined in items (3) and (4) above, and that it then became incumbent upon claimants to make some effort

to cross the Steel Workers' picket line. As this effort was not forthcoming claimants have incurred the added burden of eliminating the doubt cast upon their claim for eligibility. *See Rhodes v. Unemployment Compensation Board of Review,* 35 Pa. Commonwealth Ct. 198, 386 A.2d 612 (1978).

We repeat that we do not believe a claimant must necessarily show actual violence on the picket line, or otherwise test threats accompanied by a show of force, for we have no intention of stating a rule of law which would engender confrontation, hasten violence, and result in actual personal injury. We do believe, however, that a legal distinction exists between persuasion, sometimes even harsh persuasion, and intimidation. In the instant case, there is simply no evidence in the record that the claimants were threatened, or otherwise faced with a show of force, so as to induce a reasonable fear of violence. The mere presence of pickets, however massed, and physical obstruction making entry to the plant difficult but not impossible, does not amount to the sort of intimidating behavior which we construe as justification for failure to at least test a picket line, regardless of the existence of threats and intimidation in prior strikes.

In *Tickle,* for instance, claimants were faced with intoxicated pickets armed with steel balls and hammers, who made specific threats directed to the claimants, and who actually grabbed two members of claimants' class in order to dissuade them from going to work. In *Lakeview Forge Co. v. Unemployment Compensation Board of Review,* 36 Pa. Commonwealth Ct. 204, 387 A.2d 984 (1978), we allowed benefits to a class of claimants who refused to cross a massed line of club-and ice pick-bearing pickets who pushed claimants away from the employer's plant entrance, threatened personal injury, broke plant windows, punctured and slashed tires, and harassed all those seeking in-

gress or egress from the plant. *See also Westinghouse Electric Corp. v. Unemployment Compensation Board of Review,* 35 Pa. Commonwealth Ct. 150, 384 A.2d 1372 (1978) (benefits allowed when mass pickets bearing clubs and wearing hard hats threatened claimants, refused access to plant, broke a windshield and swung a club in direction of a claimant's head).

In *Murphy,* on the other hand, there was but one belligerent episode carried out by nonstriking union members, after which there persisted rumors that continued belligerency would result if claimants attempted to cross the picket line set up by striking employees. We denied benefits on the grounds that one incident in an otherwise peaceful strike does not justify a refusal to work, nor do rumors without an actual show of force. At all other times the picket line had been peaceful and entry to the plant gone unhindered. *See also Borello v. Unemployment Compensation Board of Review,* 40 Pa. Commonwealth Ct. 353, 397 A.2d 471 (1979) (benefits denied for failure to cross peaceful picket lines).

In *Rhodes v. Unemployment Compensation Board of Review, supra,* claimants were faced with massed pickets and barricaded entrances but no violence, physical threats, fights, misconduct, broken windows, damaged autos, or anything of a related nature. Management, supervisory, and nonunion employees all entered and departed the employer's premises without incident. We affirmed the denial of benefits on the grounds that, absent " 'violence, intimidation or physical restraint, [the claimants] . . . failed to cross the picket line because they had yielded merely to persuasion of the striking union and, therefore, did not report to work as a result of their own volition.' " *Id.* at 213, 386 A.2d at 618. *See also Taylor v. Unemployment Compensation Board of Review,* 40 Pa. Commonwealth Ct. 303, 398 A.2d 231 (1979).

From our examination of the record, it is apparent to us that the instant work stoppage more closely resembles the stoppages in *Murphy* and *Rhodes* than *Tickle* and its progeny. There is no evidence of any violence, or threats thereof accompanied by a show of force directed toward the claimants, at the employer's premises, for the purpose of preventing their entrance to the plant. There is no evidence that obstruction was any more severe than in *Rhodes,* or that the violence of prior strikes would necessarily repeat itself. As there is substantial evidence in the record to support the Board's finding that the claimants did not attempt to cross a nonviolent picket line, we must affirm the order of the Board and direct that claimants are ineligible for unemployment compensation benefits for the period of September 9, 1976 through January 3, 1977.

Judges DiSALLE and CRAIG dissent.

ORDER

Now, September 4, 1979, the orders of the Unemployment Compensation Board of Review, Nos. B-149875 through B-149880, are hereby affirmed.