Opinion by
Judge Rogers,
G. C. Murphy Company has appealed from an order of the Unemployment Compensation Board of Review affirming a determination of a referee that the application of William M. Krupa for unemployment benefits for weeks ending May 21, 28, June 4, 11 and 18, 1972 should be allowed. The parties stipulated at the referee’s hearing that Krupa’s application should be representative of the claims of about 243 employes of G. C. Murphy who did not work from May 15 until June 18, 1972 because of a labor dispute.
The site of the events in this case is a premises occupied by G. C. Murphy in McKeesport on which there *576 are two buildings, a warehouse and a construction and sign shop. The premises is enclosed by a fence and has two gates, one on 31st street for entry on foot and a drive-in entrance on 28th street. Immediately before May 15, 1972, the following numbers and classes of employes were employed at the McKeesport warehouse property: six security guards, about 270 production employes, 28 nonexempt clerical workers, three exempt clerical workers, nine merchandisers, 40 management people and 33 sign shop and construction department employes. The 33 sign shop and construction employes worked in the construction and sign shop building, the security guards presumably worked throughout the premises and the balance of the employes worked in the warehouse. The first shift production and nonexempt clerical workers were required to be at their work stations at 7:00 o’clock A.M., the sign shop and construction workers started work not earlier than 7:30 o’clock A.M.
The 33 sign shop and construction workers did not belong to any labor organization. The six security guards are members of Local Union 205 of the Brotherhood of Teamsters, Chauffeurs and Helpers; the 270 production workers are members of Warehousemen Local Union 249 of the Brotherhood of Teamsters, Chauffeurs and Helpers; and the 28 non-exempt clerical workers had designated Warehousemen Local Union 249 as their bargaining agent. The 243 workers represented by Krupa are production workers, members of Local 249 and nonexempt clerical workers for whom that Union is bargaining agent. Both Local 205 and Local 249 are affiliated with Teamsters Brotherhood whose constitution provides that crossing the picket line of another affiliate of the Brotherhood may be the basis for charges against and disciplinary penalties upon its members, including fines, suspensions and expulsions. The contract of Local 249 and G. C. Murphy provided that refusal to work on a premises where any strike is in progress should not be a breach of contract or grounds for disciplinary action by the employer.
*577 The six security guards, members of Teamsters Local 205, went on strike and posted pickets at the two entrances to the employer’s premises on Monday, May 15, 1972, four stationing themselves at the 28th street vehicle entrance, and two at 31st street pedestrian entrance. This picketing by the security guards continued until the labor dispute was ended on June 18, 1972, and was unaccompanied by violence, threats of violence or any other unlawful conduct on the part of the striking employes. No employes, except management personnel, reported to their work stations on May 15 or May 16, 1972.
Apparently as a result of rumor that the nonunion construction and sign shop employes intended to cross the picket line, a group of employes, including, according to the estimate of the steward of Local 249, about 100 of the 270 production workers, assembled at the 28th street entrance to the warehouse property on the morning of May 17, 1972. Four or five garbage trucks owned by the City of McKeesport and manned by 25 city workers, fellow members of the security guards of Teamsters Local 205, arrived at the 28th street entrance. The trucks were stationed across the entrance and the city workers, armed with machetes, clubs, rakes and brooms, descended from the trucks and behaved, quoting the referee, “in a threatening and aggressive manner” for about a period of 45 minutes, after which they left. The McKeesport police were summoned but never appeared. The city workers never returned to the warehouse property after this incident, although some of their trucks were observed in the vicinity on later occasions, whether on routine garbage collection rounds or for more sinister reasons being the subject of conflicting conjecture by witnesses.
The visitation of the city workers on May 17, 1972 occurred, according to the union witnesses, before 7:00 o’clock A.M. and, according to the employer’s witness at about 7:30 o’clock A.M. The referee made no finding *578 in this regard, although the time of their arrival seems to us to have significance, since it bears on whether the 100 or so production workers then present, scheduled to be at work at 7:00 o’clock A.M., were, as they contend, prevented from entering the premises by the activities of the city workers.
After this incident, the employer instructed the nonunion construction and sign shop workers not to report to the warehouse location, paid all of them full wages for the duration of the strike and assigned some of them to duties at other facilities of the employer in the vicinity. The employer explained this action as an effort to avoid further confrontation of these workers with Local 205’s partisans and on the ground that there would be little work for them at the construction and sign shop site because their supplies came by truck and truckers were honoring the security guard’s picket lines. The record reveals, and the referee and the Board of Review found, that there was work available for the claimant and his fellow production workers and for the nonexempt clerical workers at the warehouse.
The Bureau of Employment Security denied benefits but a referee after hearing, at which it was stipulated that Krupa’s application should be representative of the claims of 243 production and nonexempt clerical workers, concluded that eligibility for compensation had been established. On appeal the Board of Review remanded the record for a further hearing before a referee,[1] after which it filed its decision adopting the referee’s findings and conclusions and affirming his determination.
*579 Section 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess. P.L. (1937) 2897, as amended, 43 P.S. §802 (d), provides:
“An employe shall be ineligible for compensation for any week—
“ (d). In which his unemployment is due to stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in, the dispute.”
The claimants bore the burden of proving their eligibility. Kanouse v. Unemployment Compensation Board of Review, 9 Pa. Commonwealth Ct. 188, 305 A.2d 782 (1973). Since a labor dispute was in progress, the rule required the instant claimants to prove by the preponderance of evidence that their stoppage or cessation of work was a result of causes other than their or their union’s participation in the dispute. The claimants’ witnesses testified that they desired to work at all times during the strike but did not do so because they feared personal injury and that these fears were caused by: rumors in the city of McKeesport that there would be violence if they attempted to work on May 15 and 16, 1972; the violence of May 17, 1972 when the city workers appeared and prevented the construction and sign shop *580 workers from entering the employer’s property; and continued rumors after May 17, 1972 that there would be further violence if they crossed the picket lines. The employer’s witnesses emphasized the nonviolent nature of the picketing by the guards throughout the strike, the fact that the claimants did not attempt to cross the picket lines either before or after the May 17, 1972 incident and a number of other circumstances from which they argue that the Board should have inferred that the claimants were simply honoring the picket line and hence participating in the strike.
The now firmly established and salutary court-made rule governing the decision here is that workers not participating in a labor dispute who refuse to cross a picket line due to a reasonable and genuine fear of physical injury inspired by actual or threatened violence are eligible for unemployment compensation. The statement of the rule appears first in Pennsylvania in Phillips Unemployment Compensation Case, 163 Pa. Superior Ct. 374, 377, 62 A.2d 84, 86 (1948), expressed by Judge Reno as follows:
“If an employe is prevented from working through no act of his own, as where he is forcibly barred from working, he would be entitled to compensation. But if a picket line is maintained within the limits permitted by law and there is no physical compulsion exerted to prevent employes from passing the picket line, non-strikers are unemployed solely by their own choice.”
In McGann Unemployment Compensation Case, 163 Pa. Superior Ct. 379, 62 A.2d 87 (1948), decided the same day as Phillips Unemployment Compensation Case, supra, Judge Reno expanded on the rule by the following observations:
“At the hearing before the board additional testimony was offered. A member of the strike committee of the Masters, Mates and Pilots testified----His statement that the striking unions would have re *581 pelled any attempt to cross the picket line amounts only to an undisclosed intention to do violence. There is no evidence of any attempt to cross the picket line peacefully or by force. We conclude that the board’s findings that the claimants made no effort to cross the picket lines, that they were not actually threatened, and that there was no attempted violence are supported by substantial and competent evidence.
“The mere statement by a claimant that he refused to cross a picket line because of fear of bodily harm is not enough to demonstrate that his unemployment was involuntary in a situation where there was not a single overt act of violence of any character, leading a reasonable person to believe that he would be in physical danger in the event he attempted to cross the picket lines. A non-striker’s fear of injury must be real and substantial and not nebulous. Strike and picket lines are not always accompanied by violence, intimidation and physical restraint. In the absence of evidence to the contrary we may assume that picketing is carried on peacefully and within the limits pemitted by law.” 163 Pa. Superior Ct. at 385, 62 A.2d at 90.
In both McGann and Phillips the Superior Court affirmed decisions by the Board of Review denying benefits as supported by substantial evidence.
In Curdo Unemployment Compensation Case, 165 Pa. Superior Ct. 385, 68 A.2d 393 (1949), although the allowance of compensation was reversed on other grounds, the Superior Court concluded that the claimants were not disqualified for refusing to cross a picket line in the following circumstances, and by the following reasoning:
“Claimant did not voluntarily leave his work without good cause. He and about 150 other production workers remained at work the entire first day of the •strike. But the following morning when they reported for work they were opposed by approximately 200 *582 pickets who in massed groups denied their right of access to the plant. The picket line at the outset of the strike obviously was not maintained within the limits permitted by law: cf. Westinghouse Elec. v. United Elec., 353 Pa. 446, 46 A.2d 16. From and after March 9, 1948, the striking union maintained a picket line around the plant on a 24 hour basis, excluding all but office workers and construction personnel. Though at times only a skeleton line was maintained yet it was made apparent that a line of 100 or more pickets would be resumed if any production employes attempted to resume work. The findings of the Board, though somewhat equivocal, support this conclusion: Although there was no violence, there were threats of it and the restraining action of the pickets was of such coercive nature as to supply claimant with good cause for not making further attempts to enter the plant. Sturdevant Unemployment Comp. Case, 158 Pa. Superior Ct. 548, 556, 557, 45 A.2d 898. Cf. Phillips Unemploy. Compensation Case, 163 Pa. Superior Ct. 374, 62 A.2d 84.” 165 Pa. Superior Ct. at 388, 68 A.2d at 394.
In Franke Unemployment Compensation Case, 166 Pa. Superior Ct. 251, 70 A.2d 461 (1950), the Board’s denial of compensation was affirmed with the following explanation on the question here pertinent:
“Appellant’s argument that the evidence does not support the board’s finding that the stoppage or cessation of work by claimants was voluntary is without merit. . . . The commercial manager of Pittsburgh Railways Company and Pittsburgh Motor Coach Company testified that there were no signs of physical violence throughout the strike period. Claimants’ own witness stated that, notwithstanding the verbal protest of the pickets, on the morning of September 24, 1946, the buses were taken out of the Lexington Avenue garage without incident. The testimony also *583 established that claimants had no trouble with the existing picket lines when they returned to work on October 14, 1946. There was testimony that at one time pickets stood in front of the buses at some of the garages, but there is no evidence in the record of actual or probable violence. Where the bus drivers persisted they encountered no difficulty with the picket lines. The board’s findings that there was no violence or serious threats of violence, and that claimants’ failure to operate the buses was not due to physical compulsion but to the voluntary decision on the part of claimants not to cross the picket lines of the striking union are supported by competent and substantial evidence.” 166 Pa. Superior Ct. at 256, 70 A.2d at 464.
In Urbach Unemployment Compensation Case, 169 Pa. Superior Ct. 569, 83 A.2d 392 (1951), the crucial statements supporting the court’s affirmance of a disallowance of benefits are:
“True, there was violence on the picket line on one occasion. It is mentioned in the Board’s sixth finding, supra, and described in its fourth finding. It occurred on September 8th, when pickets attacked a truck leaving the plant. This incident, resulting from Dravo’s attempt to transport material out of its plant, does not indicate violence against the Fabricators or prove that they were subjected to violence or intimidation on August Jfth and the other intervening working days. In truth, there is no substantial evidence of violence exerted against the Fabricators. Had the testimony of several of Fabricators’ officers been accepted the Board might have found that Marine Workers’ officers had threatened violence but at most the threats were shadowy and vague, were not accompanied by a show of force, and engendered no fear of injury. Studious examination of the whole record has not convinced us that the Board capri *584 ciously disregarded Fabricators’ testimony or that we should substitute our judgment upon the evidence for that of the Board.
“The case is ruled by the McCann case, supra, where we said, p. 385: ‘We conclude that the board’s findings that the claimants made no effort to cross the picket lines, that they were not actually threatened, and that there was no attempted violence are supported by substantial and competent evidence.... A nonstriker’s fear of injury must be real and substantial and not nebulous.’ ” (Emphasis in original.) 169 Pa. Superior Ct. at 573, 83 A.2d at 394.
Finally, in Glass Industry Machine Workers Unemployment Compensation Case, 7 Pa. Commonwealth Ct. 385, 298 A.2d 700 (1973), this court affirmed a denial of benefits where the claimants’ evidence in justification for their refusal to cross the picket lines was that in the past, in other strikes, when attempts were made to cross picket lines, violence had occurred.
While it seems to us that these cases comprehensively state the rules to be applied and provide sufficient examples for testing new matters, the Board complains that the law is not clear as to what actions by strikers or their partisans are sufficient to cause a non-striker’s fear of injury to be substantial and real and not nebulous or fanciful. Our reading of the cases and our consideration of the subject generally leads us to the following conclusions : (1) That mere rumors that violence will occur are not justification for refusal to cross peaceful picket lines to report for available work; (2) that the fact that in past strikes violence has occurred is not justification for refusal to cross peaceful picket lines; (3) that the violence necessary to justify a refusal to cross picket lines must, in the ordinary case, be violence at the picket lines at the employer’s premises and have for its purpose, or its effect must be, to prevent the claimants from entering or leaving the employer’s premises in the pursuit of *585 their usual employment; (4) that threats of violence in the ordinary case must, in order to justify a refusal to cross picket lines similarly occur at the employer’s premises, have the purpose and effect of preventing the claimants from working and must in addition be accompanied by a show of force at the picket lines sufficient to instill in a reasonable person a genuine fear for his personal safety; (5) that one occasion of violence or threats of violence accompanied by a show of force, followed by an extended period of peaceful picketing, will not justify a continued refusal to cross picket lines in the absence of evidence that the unlawful activity will probably be resumed in the event of future attempts to cross picket lines, and that law enforcement agencies are unable or unwilling to maintain order and protect persons lawfully seeking to continue their employment; (6) that a claimant who refuses to cross picket lines does not carry his burden of proving eligibility for unemployment compensation by expressions of fear for his personal safety without proof of violence or threats of violence as described in (3) and (4) or proof of an occasion of violence, the likelihood of its reoccurrence and the inability or unwillingness of law enforcement agencies to maintain order; and (7) that the absence of evidence of any effort by claimants to cross peaceful picket lines, although not itself disqualifying, casts doubt on their claim for eligibility. Obviously the law can and will, despite general statements of rules, provide relief in exceptional cases. Hence, in the class of case under consideration, violence away from the picket line could conceivably be so extreme and so clearly threatening as to justify a refusal to cross a peaceful picket line. Further, expressions by law enforcement agencies of willingness to maintain order, belied by experience and the circumstances, could be found to be insufficient grounds for disqualifying a worker refusing to cross a picket line after a violent incident followed by peaceful picketing.
*586 It remains to test the facts of the instant case as found by the referee and the Board against the rules. Concerning May 15 and 16, 1972, the only finding is that “rumors continued to circulate that violence would occur if an attempt by non-management personnel was made to return to work.” Rumors do not justify refusal to work. The referee found: “Hearing that the sign shop and construction workers had decided to cross the picket line the A.M. of the 17th ... [the production] ... and the nonexempt clerical workers were planning to follow the lead of the sign shop and construction workers” and that “the sign shop and construction workers were stopped” [by the city workers]. This incident formed the basis for the referee’s next finding that the “leaders of Local 205 created the impression that there would be violence on May 17, 1972 and thereafter should any employes, other than management type, attempt to cross the picket line on May 17, 1972 or thereafter.” The creation of- an impression is obviously no more than an unspoken threat which, unaccompanied by a show of force, is insufficient justification for a continued failure to cross a peaceful line for more than a month after one occasion of violence followed by a month of peaceful picketing. The referee finally found that the claimants did not report after May 17, 1972, “because of the incident... and their concern over the possible return of the non-employes and the possible effects of such a return visit.” The claimants concern over a possible return of the city workers and the possible effects of such a return is not evidence that unlawful activity will probably occur and that it would not be prevented if attempted. The referee failed to find several significant circumstances which are undisputed on the record: that the handful of picketing security guards neither engaged in nor threatened violence before, during or after May 17, 1972; that anyone who cared to enter the employer’s premises did so without hindrance except for the short period on May 17, 1972 when the *587 city workers intervened to prevent the construction and sign shop workers from working; and that the claimants never attempted to cross the lines at any time. We conclude therefore that the claimants did not carry their burden of proving that their unemployment was caused by a genuine fear of physical injury induced by violence or the threat of violence during any of the weeks beginning May 15, 1972 and ending (with the strike of the security guards) on June 18, 1972.
Order
And Now, this 9th day of June, 1975, it is ordered that the order of the Unemployment Compensation Board of Review be and it is hereby reversed and the appeal of G. C. Murphy Company sustained.

. The record reveals that after either the referee’s or the Board’s determination the claimants were paid benefits. These payments are not subject to reimbursement or recoupment by Section 804(b) of the Unemployment Compensation Law, 43 P.S. §874 (b). Neither the claimants nor their union have participated in the appeal.