Unemployment Compensation Board of Review of the Commonwealth of Pennsylvania *v.* John J. Wallace, Appellant. Wilkes-Barre Publishing Company, Intervening Appellee.

Argued March 3, 1976, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Mencer, Rogers and Blatt. Judge Kramer did not participate.

*Peter B. Broida*, with him *Sol Lubin*, for appellant.

*Daniel R. Schuckers*, Assistant Attorney General, with him *Sydney Reuben*, Assistant Attorney General, and *Robert P. Kane*, Attorney General, for appellee.

*Richard M. Goldberg*, with him *Richard S. Kempes*, for intervening appellee.

Opinion by Judge Wilkinson, April 2, 1976:

Following the filing with the Unemployment Compensation Board of Review of a petition for mass appeal, an agreement was executed between the interested parties that the final disposition of the appeal of John J. Wallace from the decision issued by the Bureau of Employment Security under date of January 21, 1974, would be applied to all members of Local 120 of the American Newspaper Guild (Guild) who are claimants growing out of this fact situation. The names, addresses, appeal numbers, and social security numbers of these some 122 additional claimants were attached to the agreement. By this process, the instant case has been made what is denominated "the lead case in this appeal."

The case grows out of claims for unemployment benefits by the members of the Guild as a result of their being unemployed for the weeks ending November 24, December 1, and December 8, 1973. The claims were disallowed by the Bureau of Employment Security, by the referee, and by the Unemployment Compensation Board of Review. The basis for the disallowance is Section 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(d), which provides:

> "An employe shall be ineligible for compensation for any week—
>
> . . . .
>
> "(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in, the dispute."

On November 20, 1973, the members of the International Typographical Union Local 187 initiated a strike and established picket lines at the Wilkes-Barre Publishing Company, the newspaper publisher for which claimants worked. The claimants who were on duty at the time the strike was called and picket lines established understood they could leave then or could stay until the "shift" they were working was finished. Some left and others

completed their shifts. A careful reading of the record makes it quite clear that management did not tell them at that time or at any time during the course of the strike to either stay away or to return.

Most of the disputed fact situations that are troublesome in these cases involving unemployment compensation claims during a labor dispute are not present here. Clearly, this was a strike, not a lock-out. The picket line was peaceful, there being no violence or threats of violence. The claimants clearly refused to cross the picket line.

The very narrow issue presented is whether the record supports the finding that claimants refused to cross the picket line because of their loyalty to the labor movement and in support of their brother union or whether they declined to do so because it was known that there was no work available. We hold that the record amply supports the findings that the claimants were participating in the labor dispute and that this caused the stoppage of work, and we must affirm.

The general law in this subject area of duty to cross the picket line has been recently thoroughly reviewed by Judge ROGERS in *Unemployment Compensation Board of Review v. G. C. Murphy Co.*, 19 Pa. Commonwealth Ct. 572, 339 A.2d 167 (1975), making it unnecessary to review here. We will deal directly with the factual question of what the record reveals as to whether the claimants' unemployment was due to their refusal to cross a picket line or due to lack of work.

First, and it seems to us important, on the notice of application made by claimants, they gave as their reason for separation:

"Honoring picket line in accordance with contract provisions." The employer responded to the question of the reason for separation:

"Employee is honoring peaceful picket line work is available."

The contract provision to which the claimant refers above and to which he referred throughout the hearing is Article XXII, paragraph 5, of the Guild contract, which provides:

> "Employes shall not be required to handle struck work or work destined for struck departments or shops, nor shall they be required to pass a picket line formed as a result of a labor dispute."

John J. Wallace, the claimant in this lead case and, for the past seven years, president of Local 120, testified that one of the first things he did when the strike occurred was as follows:

> "Q. Did you talk with management at all that evening?
>
> "A. Yes, I talked with Mr. Smith; I talked with John Hourigan; I talked—I won't swear if I talked immediately with William Hourigan, but at some time I did.
>
> "Q. For what purpose?
>
> "A. To inform Mr. Hourigan and Mr. Smith that the provisions of the contract between Local 120 of the Newspaper Guild and the Wilkes-Barre Publishing Company, includes under Article XXII, Paragraph 5, the section which states:
>
> 'No Guild member shall be required to cross the picket lines as a result of a labor dispute.'
>
> I wanted to make this official with Mr. Smith and with Mr. Hourigan so that they clearly understood the position of Local 120, in this dispute which was occurring between the I.T.U. and the Publishing Co."

Of course, such a clause protects the members from disciplinary action by the employer but in no way affects their ineligibility for unemployment compensation if they refuse to cross a picket line and are unemployed as a result thereof.

Another substantial piece of undisputed evidence that the claimants would not cross the picket line for any pur-

pose was that they called management each day and requested that their personal mail be carried out across the picket line to them.

Finally, any doubt that might have existed was removed when John J. Wallace testified that he was invited several times by management:

" 'Why don't you come in out of the cold and talk to us in here?' Our response would be: 'It's a hell of a lot nicer out here—come on out here,' which he would."

On cross-examination, John J. Wallace was asked:

"Q. You also testified that you were asked into the building on several occasions by, I believe, Mr. Hourigan of the Publishing Company?

"A. Yes, sir.

"Q. Why did you not enter the building at those times?

"A. Because of our contractual agreement with the Wilkes-Barre Publishing Company, for one. Number 2: If, as the president of the local, I crossed the line why shouldn't everybody else cross the line? Number 3: we still have a number of people within the Guild who were quite fearful of the picket."

It is significant that at such times, John J. Wallace did not give as a reason for not crossing the picket line that work was not available. When this specific matter came up, the following appears in John J. Wallace's testimony:

"Q. In other words, could you give us the basis for your decision that no work was available, once again for the record?

"A. I will not say there was no work available, because I'm not in a position to make that determination. What I said was that any work that would be produced by the Guildsmen, particularly the Editorial Department of which I am connected, could go nowhere because our product is then taken over by the Printers, by the Stereo-

typers, by the Pressmen, by the Mailing Room out to the public.

"Q. Mr. Wallace, is it correct to say that you will not say on the record that there was no work available for you or members of your union during the strike?

"A. Let me put it this way: Our function in putting out a newspaper, only the Publisher could determine whether there was work or not. I can't say there is or is not work for Guildsmen at the Wilkes-Barre Publishing Company during a Printer, Stereotyper and Pressmens' strike.

"Q. You said you did not enter the building of the Wilkes-Barre Publishing Company at all during the strike, is that correct?

"A. That's right.

"Q. Did you ever ask any member of the management of the Wilkes-Barre Publishing Company if work was available?

"A. No, sir."

Claimant relies heavily on *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968), as establishing that claimants did not have to cross the picket line if work was not available. Quite so. However, in the instant case, there is no showing that work was not available. Indeed, there is positive evidence in this record from which the referee and the Board of Review could conclude that work would have been available had the claimants presented themselves to do it.

Accordingly, we enter the following

ORDER

Now, April 2, 1976, the order of the Unemployment Compensation Board of Review, dated August 15, 1975, disallowing the appeal and affirming the referee in disallowing benefits, is affirmed.