490 Pa. 607 (1980)
417 A.2d 205
Domenic A. BORELLO, Jr., et al., Appellants,
v.
COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.
Robert F. BOLSINGER et al., Appellants,
v.
COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.
Eneo PANICCO et al., Appellants,
v.
COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.
Supreme Court of Pennsylvania.
Argued March 4, 1980.
Decided July 16, 1980.
*608 *609 Stanford A. Segal, Gatz, Cohen, Segal & Koerner, P.A., Pittsburgh, for appellants.
Michael D. Klein, Asst. Atty. Gen., Unemployment Compensation Board of Review, Harrisburg, for appellee.
Before EAGAN, C.J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

OPINION
NIX, Justice.
This is an appeal from the decision of the Commonwealth Court which affirmed the orders of the Unemployment Compensation Board of Review (Board), appellee, denying benefits to appellants under Section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, Second Exec. Sess., P.L. (1937) 2897, art. IV, § 402, as amended, 43 P.S. § 802(d).
Appellants are members of three separate groups, each of whom were employed by Townsend and Bottum, Inc., for the construction of the Bruce Mansfield Fossil-Fuel project at Shippingport, Pennsylvania during 1976. The three groups consisted of: (1) members of various building and construction craft unions (Craft Unions); (2) members of the Iron Workers Local 3 (Ironworkers); and (3) members of Millwrights Local 2235 (Millwrights).
A review of the record reveals the following sequence of events. On May 31, 1976, various labor-management agreements covering among others, the appellants, expired. On or before June 1, 1976, the Craft Unions did reach an accord, but neither the Ironworkers nor the Millwrights were able *610 to reach mutually satisfactory agreements with Townsend and Bottum. Prior to the expiration of the respective contracts, the Ironworkers and Millwrights offered to enter into an interim agreement but required as part of that agreement that any wage increase subsequently won for the new contract be retroactive to June 1, 1976. Management refused and stated as a matter of policy "that if no agreement tentative or otherwise, was reached by June 1, 1976,. . . it would . . . not allow the Ironworkers and Millwrights to enter the various construction sites. . ." (Board's Finding of Fact 15). No further formal offer to continue work was conveyed by either party before the deadline. No evidence of a formal strike vote nor any instruction from union leaders to its membership not to report for work on June 1, can be found in the record.
The construction site security guards were advised by management that as of June 1, 1976, Ironworkers and Millwrights were to be denied entry while all other building and craft union members could be admitted as usual. On the morning of June 1, 1976, certain job stewards and union representatives reported to the construction site and were denied entry by the security guards. The same occurred on June 2, 1976. On June 3, 1976, the two foreclosed unions set up peaceful picket lines at various job sites throughout Western Pennsylvania including the instant project. Their "picket signs" asserted the failure of management to bargain in good faith. The Craft Union members reported for work that morning, but did not enter the project for work nor did they do so until after the labor dispute was resolved on June 21, 1976.
Appellants filed for unemployment compensation for the period from June 1, to June 21, 1976. After their claims were denied by the Bureau of Employment and Security, the referee agreed with that determination, and the Unemployment Compensation Board of Review affirmed on appeal. The matters were consolidated before the Commonwealth Court and after argument, it found the Board's determination supported by the evidence and thus denied appellants' request for relief. 40 Pa. Cmwlth. 353, 397 A.2d 471 (1979).
*611 We turn first to the claim by appellants, Millwrights and Ironworkers that the lower court erred in affirming the denail of compensation under Section 402(d). Our scope of review is limited to a determination as to whether any errors of law were committed and, "absent fraud," that the Board's findings are supported by the evidence. Unemployment Compensation Board of Review v. Tickle, 19 Pa.Cmwlth. 550, 339 A.2d 864 (1975); see, e.g. Erie Forge and Steel Corporation v. Unemployment Compensation Board of Review, 400 Pa. 440, 163 A.2d 91 (1960).
The Millwrights and Ironworkers assert their entitlement to unemployment benefits under Section 402(d) on the grounds that they were "locked-out." That provision provides:
An employe shall be ineligible for compensation for any week 
(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute. (Emphasis added.)
The determinative factor to the requested relief thus becomes whether the work stoppage was caused by an employer "lockout." The test for assessing responsibility for the work stoppage for purposes of the instant provision was enunciated in Erie Forge and Steel Corporation v. Unemployment Compensation Board of Review, supra, 400 Pa. at 444-445, 163 A.2d at 91.

*612 . . . The law contemplates that collective bargaining will be conducted in good faith, with a sincere purpose to find a basis for agreement. Neither an adamant attitude of "no contract, no work" on the part of the employees, nor an ultimatum laid down by the employer that work will be available only on his (employer's) terms, are serious manifestations of a desire to continue the operation of the enterprise. While either or both of these positions may legitimately be taken by the parties during the bargaining negotiations prior to the expiration of the existing contract, when the contract has in fact expired and a new agreement has not yet been negotiated, the sole test under § 402(d) of the Unemployment Compensation Law . . of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" and the disqualification for unemployment compensation benefits in the case of a "stoppage of work because of labor dispute" does not apply. (Emphasis added).
This test has been consistently followed.[1]Unemployment Compensation Board of Review v. Sun Oil Co., 476 Pa. 589, *613 383 A.2d 519 (1978); Philco Corporation v. Unemployment Compensation Board of Review, 430 Pa. 101, 242 A.2d 454 (1968). As was recognized in Philco Corporation, supra, the Erie Forge test while "easy to verbalize (is) most difficult to apply to any given set of facts." The practical approach suggested there is "to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." Id., 430 Pa. at 103, 242 A.2d at 455 (Emphasis added).
Appellee contends that the Millwrights' and Ironworkers' demand for retroactive application from the date of expiration for any additional benefits won under the new contract as a prerequisite to its continuing work, caused the work stoppage and thus blame lay with those parties and not with the employer. Both the Board[2] and the Commonwealth *614 agreed.[3] The problem with this reasoning is it fails to apply the Erie Forge test. Under that test the focus is upon the actions of the parties "after the contract has in fact expired" and immediately preceding the work stoppage. The assertions, demands and threats of the parties prior to that time are not to be controlling.[4] Such responses are to be anticipated in the effort to reach agreement before the expiration deadline. What is of concern is which party is responsible for causing the work stoppage once it is evident that the expiration date has been reached and a new agreement has not been signed. The demand for retroactive benefits was prior to that point and thus is of no moment in the analysis.
The reasoning for this view is that the parties are entitled to use all legitimate pressures they can bring to bear during the negotiations. However, in determining the workers' right to unemployment benefits, entitlement must turn on the actual conduct of the respective sides and not upon the rhetoric of the negotiations.
The testimony reveals a policy decision on the part of management to exclude the Millwrights and Ironworkers if no contract was signed.[5] A directive to that effect went to *615 the guards manning the construction site entrance gates. On the other hand no evidence was presented which showed any directive from the unions' leaders to membership instructing them not to report. In fact the testimony of the business agent for the Iron workers who also acted as negotiator, shows that the workers were affirmatively told to report.[6]
*616 The evidence presented goes on to establish that members of the unions reported for work at the usual time on June 1, 1976, approached the gates to enter the project and were rebuffed by the security guards. In one instant, a union representative (Mr. Jack Doyle), who was able to gain admittance under the guise of a visitor, was tracked down and bodily removed from the premises.[7] An employee of *617 Townsend and Bottum, Inc., who was responsible for the maintenance of security at the gates corroborated the Ironworker's testimony.[8] The exclusion procedure was also explained by another security guard.[9] Finally, the Project *618 Labor Coordinator for the employer admitted that the Millwrights and Ironworkers were denied entry to the project site on June 1, 1976.
Q: I'm talking about June 1 and 2, now.
A: Yes.
Q: They were turned away, the ironworkers and millrights?
A: That's correct.
(N.T. 563)
Appellees would have us find that the failure of the Millwrights and Ironworkers to have presented, through an authorized union representative, a written offer to continue working disqualified the members from receiving benefits. In effect, this would be an attempt to require a commitment that Section 402(d) was not designed to elicit. Section 402(d) was not designed to confer a preference at the bargaining table. The evidence presented at the Board hearing showed that several representatives and members of the Millwrights and Ironworkers reported for work on the morning of June 1, 1976. The first contact between the parties following the expiration of the contract reflects that the appellants were willing to continue to work under the terms of the prior agreement and was prevented from doing so by the employer. By so doing, the appellants offered to continue working for a reasonable time under the circumstances, at the pre-existing terms and conditions of employment.
Townsend and Bottum, Inc. by directive to their security guards specifically turned away those union members and thereby failed to permit work to continue under the same conditions. The evidence overwhelmingly proves that it was the employer who first refused to maintain the status quo, and thus the work stoppage was the result of a lock-out.
Although the weight to be given the evidence and the credibility to be afforded the witnesses are within the province *619 of the Board as finder of fact, Unemployment Compensation Board of Review v. Tickle, supra; Shira v. Unemployment Compensation Board of Review, 10 Pa.Cmwlth. 457, 310 A.2d 708 (1973), such a body is not free to ignore the overwhelming evidence in favor of a contrary result not supported by the evidence. Here the Board's findings are contrary to the corroborated credible testimony and cannot be upheld. The record clearly establishes that the Millwrights and Ironworkers were locked out and their rights to benefits should not have been foreclosed.
We now turn to the remaining appellants from the Craft Unions who present a different question for our consideration. When the Craft Union reported for work on June 3, 1976, they found that the Millwrights and Ironworkers had established picket lines. Appellee asserts that the Craft Unions' failure to enter the project that day was caused by their choice to honor the picket lines. We agree that the record amply supports such a view and as a result, these appellants became "participants in the labor dispute" and thus not entitled to unemployment compensation benefits under the first proviso of Section 402(d).[10] Appellants counters with the claim that they did in fact cross the picket line only to find the gates locked. Thus it is asserted, they too were "locked-out" and fall within the exclusion of Section 402(d).
While the perimeters of honoring a picket line for purposes of Section 402(d) is one of first impression for this Court, the Commonwealth Court has decided a number of cases which dealt with the question of when it is permissible for a union not to cross a picket line and still recover benefits under Section 402(d). These decisions have held that where members of a union voluntarily choose to honor a peaceful picket line, they become participants in the labor dispute and thus ineligible for benefits. Unemployment *620 Compensation Board of Review v. Tickle, supra. Only where there is a reasonable fear of violence, based on a showing of threats of violence and force on the picket line can a choice not to cross be rewarded with unemployment compensation benefits. Wright v. Com., Unemployment Compensation Board of Review, 45 Pa.Cmwlth. 375, 405 A.2d 991 (1979); Unemployment Compensation Board of Review v. G.C. Murphy Co., 19 Pa.Cmwlth. 572, 339 A.2d 167 (1975); Unemployment Compensation Board of Review v. Tickle, supra.
Testimony was presented from the guards that were on duty that the entrance gates were never locked on the morning of June 3, 1976. The project Construction Manager told the Board that work was available on June the third, but that the "men were not crossing the picket line." Moreover, a Craft Union member stated in response to questioning, that he was able to and did enter the site to work on June 3, 1976 and, that while the gate was closed, it was not locked. It is conceded by all parties that the pickets behaved in a peaceful fashion at all times. We affirm the Commonwealth Court's interpretation of the 402(d) lock-out exception in this regard. The decision to respect the picket line of another, where there is no danger presented, is no different than the judgment to strike. In both situations the legislature has expressed an intention to deny unemployment benefits. The striker and those who stand with him are on the same footing and the legislature has determined that both should be denied benefits under Section 402(d).
Accordingly, the Commonwealth Court Order affirming the Unemployment Compensation Board of Review is reversed-in-part and affirmed-in-part. That portion of the Order denying benefits to the Millwrights and Ironworkers is reversed and the matter remanded to the Board for the entering of an award in accordance with this Opinion. That portion of the Order denying benefits to the Craft Union is affirmed.
LARSEN, J., joins in the majority opinion and files a separate concurring opinion.
*621 FLAHERTY, J., joins the opinion of the Court and also expresses his agreement with the sentiments set forth in the concurring opinion of LARSEN, J.
LARSEN, Justice, concurring.
I join with the majority opinion. However, I believe there should be an exception to the general rule rendering ineligible for unemployment compensation benefits those employes who refuse to cross a picket line. That exception should allow employes who honor the picket line of locked-out employes to collect unemployment compensation.
I believe the legislature did intend, as the majority notes, that "the striker and those who stand with him are on the same footing . . ." and that, in the situation presented herein, the "locked-out" picketers and those who stand with them should be on equal footing, i.e., both groups should be eligible for benefits. Unfortunately, the present language of section 402(d) prohibits us from reaching this conclusion and from finding the Craft Unions' members eligible for unemployment compensation. I urge the legislature to reconsider this issue.
NOTES
[1] An exception to the Erie Forge test was created in another decision handed down the same day, also authored by Justice Cohen. Hershey Estates v. Unemployment Compensation Board of Review, 400 Pa. 446, 163 A.2d 535 (1960). It was held that where the nature of the industry involved is such that "it would be almost impossible to operate adequately on a day to day basis," a last minute offer by the union to continue working under the existing terms and conditions, does not "constitute an offer to continue working for a reasonable time." Id., 400 Pa. at 450-451, 163 A.2d at 537. In that instance, an additional burden is placed on the union to make an offer which is reasonable and indicates a "sincere willingness to continue working for a reasonable time under the pre-existing terms and conditions of employment pending negotiations "prior to the technical expiration of contract." Id., 400 Pa. at 451, 163 A.2d at 537. Only when "it appears that such an offer would definitely not be acceptable by management" is that burden alleviated. Philco Corporation v. Unemployment Compensation Board of Review, 430 Pa. 101, 104, 242 A.2d 454, 456 (1968). (Emphasis added).

The industries involved in the Hershey Estates case and cited as triggering the exception consisted mostly of "service industries, i.e., hotel, laundry, department store, community inn, etc." Hershey Estates v. Unemployment Compensation Board of Review, 400 Pa. at 451, 163 A.2d at 537. The industry involved here, construction of a fossil-fuel project, does not fall within the category of "service industries" that would be impossible to operate on a day to day basis. Thus the Hershey Estate exception is inapplicable to the instant appeal.
[2] The Board made the following finding:

The union must bear legal responsibility for the work stoppage by its refusal to work under the terms and conditions of the expired labor-management agreement without the guarantee that any new agreement would be retroactive. The employer was willing to continue to provide work under the same terms and conditions of the expired agreement, but would not agree to retroactivity. The union's demand of retroactive benefits as a part of any interim agreement cannot constitute a bona fide offer to continue work under the terms and conditions of the expired agreement.
The employer did deny work to the members of the union at the expiration of the then existing labor-management agreement. However, it was the union's duty to offer to continue working for a reasonable time under the same terms and conditions of the expired agreement. The union did not meet this duty and responsibility for the work stoppage must be assessed against the union as the party which first refused to maintain the status quo. (Emphasis added.)
Appeal No. B-76-7-D-695 at 4, Appeal No. B-76-7-K-481 at 4.
[3] The Commonwealth Court opined:

Because of the demand for retroactive benefits by the Millwrights and Iron Workers, as established by the findings of fact, we must conclude that these claimants did not make a bona fide offer to continue work under the preexisting terms and conditions of employment and therefore the work stoppage here must be assessed against these claimants as the ones which first refused to maintain the status quo. (citations omitted). Borello v. Unemployment Comp. Bd. of Review, 40 Pa.Cmwlth. at 364, 397 A.2d at 476.
[4] As noted in n. 1, the exception set forth in Hershey Estates, supra, is not here applicable.
[5] This was revealed by the testimony of Townsend and Bottum's Construction Manager.

Q. But that's not necessarily the way it would come down from the home office, that's the way you have interpreted it in your own mind, is that correct?
A. No, it's come down from the home office that if we don't have a signed contract or a signed interim agreement that does not include retroactivity or in the case of master builders, a telegram telling us that they've reached tentative agreement, to go ahead and work, you don't work them.
* * * * * *
BY THE REFEREE
Q. Any other employer? Let the Referee ask you another question, I'm still trying to get this clear in my mind Mr. Butcher, let me give you a hypothetical situation and I ask you weigh it heavily before you answer. If labor union X has a contract with your company and this contract expires at midnight May 31 of the year, and there have been absolutely no negotiating sessions prior to the expiration of that contract, no negotiating sessions, the morning of June 1, 1976 all the members of this union show up at the gate, will they be allowed to enter?
A. No they will not.
(N.T. 547-548).
[6] Were any Ironworkers, who were members of yours, permitted to work on the Bruce Mansfield Project, as of June 1, 1976?
A: No.
Q: Had you given any instructions to your members, not to work on that project, as of June 1, 1976?
A: No.
* * * * * *
Q: Were you informed on June 1, 1976, of the efforts of your members to obtain entrance to the plant?
A: Yes.
Q: What did you tell them to do?
A: I told them to go down there and to go to work.
Q: Did you tell them to do the same thing on June 2?
A: Yes sir.
(N.T. 186, 188)
This procedure was also echoed by the President and Business Representative for the Millwrights.
Q: Were you on strike on June 1?
A: No, Sir.
Q: Yet you didn't have a contract?
A: No.
Q: Were you directing your men?
A: The men were instructed to report to work. There was no instructions given to any man not to report to the job sites.
Q: Now we know that you didn't have, with these various contractors, a signed agreement, correct?
A: Correct.
Q: And you didn't have a interim agreement, correct?
A: Correct.
Q: Still under those circumstances you were still willing to offer your services to these employers?
A: Definitely.
Q: After June 1, were you still sending your people back onto the job sites?
A: Correct.
Q: And were they still being refused entrance to these job sites?
A: To the best of my knowledge, yes.
(N.T. 438).
[7] Did you report to work on Tuesday, June 1st?
A: Yes sir I did.
Q: Did the other Ironworkers who you made reference to, report to work to your knowledge?
A: To the best of my knowledge, yes sir, I did not see personally all of them.
Q: How many would you say approximately?
A: Approximately, 50 to 60 men.
Q: What occurred when you came to work on Tuesday, June 1?
A: It was my next scheduled work day.
Q: Were you there to work?
A: Yes sir.
Q: Did the guard say that he has specific instructions regarding the Ironworkers?
A: Yes he did.
Q: And the instructions were as you told us?
A: Yes.
Q: Did you take any other action on Tuesday, June 1 to try to get into the plant?
A: No sir I didn't, I notified by business agent.
Q: Did you thereafter, try to get into the plant?
A: Yes sir, the following day that would be Wednesday, June 2nd, I again approached the gate guards and was refused entrance through the construction gates at that time I went down to the main gate and I signed in as a visitor and I entered the plant.
Q: They let you in as a visitor?
A: Yes sir.
Q: What happened when you got into the plant as a visitor sir?
A: I was on the plant for approximately 30 minutes and I was rounded up by the plant security and bodily taken off the job.
Q: When you say bodily taken off the job, would please describe what happened?
A: They put me in their truck and took me off the project.
(N.T. 173-174)
[8] I think you have indicated that you know as a fact that the Ironworkers and the Millwrights did not have a signed contract on June 1, 1976?
A: Right.
Q: Did you then deny access to the working area to those employees?
A: As close as we could sir.
BY THE REFEREE
Q: In any event, on June 1, 1976, you intended to deny entry to any craft union that did not have a signed contract?
A: Yes sir.
BY MR. SEGAL
Q: So your testimony would be as you could catch them, any Ironworker who appeared or any Millwright who appeared, would not be allowed to go into work?
A: Yes sir.
Q: And they were turned away, is that correct?
A: Yes sir.
(N.T. 409)
* * * * * *
Q: Who gave you the instructions to remove Mr. Boyle from the job site?
A: Mr. Don Lucas, Pennsylvania Power.
Q: What were the specific instructions?
A: He said, called me on the telephone and says "Jack Boyle, T & B Ironworkers, steward, is on the job and he says he's not authorized to be here, escort him off. I said as soon as I locate him, I will. I located him, told him he would have to leave the job. I drove him over to the main gate and he left.
(N.T. 414)
[9] In other words, instead of looking at their cards, mostly you just asked each member as they came through, "What craft do you belong to?" If they said millwright or ironworker, then what would you tell them?
A: We told them they wasn't allowed in this gate.
(N.T. 499)
[10] The provision provides in pertinent part: ". . . Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, . . . the labor dispute which caused the stoppage of work, . . . ." 43 P.S. § 802(d) (emphasis added).