**PHILADELPHIA GAS WORKS,**
Petitioner,

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted Oct. 28, 1994.

Decided Jan. 13, 1995.

Michael D. Jones, for petitioner.

Lisa Jo Fanelli, Asst. Counsel, for respondent.

Lanier E. Williams, for claimant, Vincent Johnson.

Before COLINS, President Judge, and NEWMAN, J., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

Philadelphia Gas Works petitions for review of an order of the Unemployment Compensation Board of Review (Board) which reversed the decision of the referee and granted unemployment compensation benefits to Vincent Johnson (Johnson).

Johnson worked for Philadelphia Gas Works as a Process Operator I which required him to operate all primary equipment relating to natural gas. On December 12, 1991, Johnson was randomly selected to provide a urine sample for drug testing which resulted in a positive result for illegal drugs.[1] Johnson was then given the opportunity to enroll in a drug rehabilitation program.

1. Pursuant to United States Department of Transportation regulations, Philadelphia Gas Works conducts drug and alcohol screening of employees in safety sensitive positions, such as the position in which Johnson was employed.

Johnson did enroll in said program and on June 23, 1992, he was again selected for drug testing. Johnson again tested positive for drug use and was given another opportunity to attend a drug rehabilitation program which he entered.

On August 5, 1992 at approximately 9:00 a.m., Philadelphia Gas Works requested that Johnson take a return to work drug test. Johnson provided a urine sample; however, the temperature of the sample fell outside the acceptable temperature range as determined by the Department of Transportation's regulations; said regulations requiring that a urine sample's temperature be between 90.5 degrees fahrenheit and 99.8 degrees fahrenheit. The Department of Transportation applies such temperature restrictions to urine samples to prevent and detect adulteration. Johnson's urine sample registered well over 100 degrees fahrenheit.

Because fever can affect a urine sample's temperature, two (2) oral temperature readings were taken of Johnson using two different thermometers. One reading registered 98.1 degrees fahrenheit and the other registered 97.4 degrees fahrenheit. Pursuant to Department of Transportation regulations, the urine sample was then sent to a laboratory for testing and an additional sample was collected from Johnson at 11:10 a.m. Johnson tested positive for cocaine use on the second sample collected at 11:10 a.m. He requested the sample be retested at a laboratory of his choice as permitted by Philadelphia Gas Works policy. Said sample was retested and again found to be positive for cocaine.

Thereafter, on August 17, 1992, Johnson was terminated from his employment based upon Philadelphia Gas Works' Drug and Alcohol policy which specified that upon three positive drug tests an employee would be terminated.[2] Johnson applied for unemploy-

ment compensation benefits which were denied by the Delaware County Job Center on the basis of Section 402(e) of the Unemployment Compensation Law (Law).[3] Johnson appealed to the referee, who conducted a hearing. Johnson testified at the hearing that in addition to the two drug tests taken of his urine by Philadelphia Gas Works on August 5, 1992, he additionally submitted to a third drug screen later that evening, at 6:00 p.m., when he went to his drug counseling session. According to Johnson's testimony, this third sample resulted in a negative reading for cocaine use. The following exchange took place between Johnson and the referee at the hearing regarding the events of August 5, 1992 as testified to by Johnson:

R [N]ow, Mr. Johnson, did you, in fact, request that a second test be done on the sample taken on August 5?

C On the sample that came back positive, yes, I did.

R And is it true, also, that came back that you tested positive also?

C Yes.

R Have you—how many tests have you taken? How many drug tests all together?

C While at Miramount, I've taken—that's the rehabilitation program, I've taken one prior one to August 5th.

R How many tests have you taken during the course of your employment with PGW?

C I don't—how to say it, approximately seven; six or seven.

R Do you recall ever taking a test that, prior to this last one, that came back with results that were not accurate?

C No.

R So up until you took this final test, in the past when you took a test and it

2. Philadelphia Gas Works policy, of which Johnson was aware, also provides that process operators are subject to random drug testing and that a positive drug test result, after returning to work from a drug rehabilitation center, could result in disciplinary action up to and including discharge.

3. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e). Section 802(e) provides, in part:

An employee shall be ineligible for compensation for any week—
(e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work.

was negative, you actually had not used cocaine.

C Right.

R And when you took a test that was positive, you actually had used cocaine.

C Right.

R And do you—I mean, do you think that—I mean, do you believe deep down inside that Dr. Barlow[4] or somebody else at PGW or at SmithKline[5] did something to make your sample positive when it really wasn't positive?

C I don't believe that's my specimen.

R You don't believe that is your specimen.

C No, I don't.

R And you signed, so when Mr.—when Dr. Barlow testified that he examined the records, starting with your sign off form and every step of the way he found it to be in compliance with the federal regulations, you don't think he's telling the truth.

C I don't think that that's my specimen. Maybe he did quite in effect follow out his regulations, but I don't believe that that's my specimen.

R But on what basis do you not—I know you don't believe, but on what basis do you not believe that?

C Because of the prior test. The test that I took at nine o'clock and that test that I took at Miramount, which were all witnessed tests by Dr. Barlow and by a counselor at the rehabilitation center. That's impossible for one test in the middle to be positive and two tests—one test before and one test after that positive—after that positive—between that positive to be positive—that's—I can't see it.

R All right. Now, so why—what you're saying, in effect, is that even though everything appears to have been done correctly with this particular sample, I should not believe that sample is cor-

rect. Now, since you have a history of cocaine use that you've already admitted to, what is it that I should take into account which would make me not believe that this is a positive test?

C Because I was in the rehabilitation program. I had taken tests prior to that. I believe you have one of the tests there. And a test prior to August 17, I took with PGW, I tested negative.

R Well, see, the problem with that is just like I have to—whenever somebody's terminated for drug use, it's the employer's responsibility to make sure a witness testifies to the chain of custody. And the reason that's required by the law is so that we have to make sure that this is, in fact, your sample that you're being accused of having had positive. By the same token, you're asking me to look at tests taken by another organization, and I can't question them as to the chain of custody. Now, you're telling me these tests were taken and somebody else witnessed it, but I don't have the witness here to question them. You're telling me that this other agency found you to, not being positive, but I don't have the people who conducted the test. I have no testimony regarding what happened with your sample according to those tests. So I really can't take those tests into account. So that's why I'm asking you, other than those tests, is there anything else you want to say that would—that you would like me to take into account, which would indicate that you were not using cocaine, therefore this test had to be negative or should have been negative? In other words, when was the last time you used cocaine?

R In June. Early June.

R Early June.

4. Dr. Barlow administered the two drug tests of Johnson on August 5, 1992 for Philadelphia Gas Works. Dr. Barlow gave extensive testimony before the referee regarding the testing procedures he used, as well as, testimony regarding the chain of custody of Johnson's urine samples.

5. SmithKline is the laboratory which Philadelphia Gas Works used to analyze urine samples for its drug testing program.

C Yes.

R Dr. Barlow, if somebody last used cocaine in early June, would they still have cocaine in their system on August 5, 1992?

EW3 No.

(R.R. 75a–77a).

The referee, on December 17, 1992, affirmed the Job Center's denial of benefits to Johnson on the basis of willful misconduct, concluding that Philadelphia Gas Works met its burden of demonstrating a reasonable rule and its violation by Johnson, i.e., testing positive for drug use on three occasions.

On appeal to the Board, the matter was remanded to the referee for another hearing to reconstruct portions of the testimony missing from the transcript due to inaudibility. Subsequent to the remand, the Board rendered its decision reversing the referee's decision and granting benefits to Johnson. The Board, in its decision noted the following in its findings of fact based upon the same record as was before the referee:

7. On August 5, 1992, employer requested claimant take a return to work drug test.

8. The Medical Review Officer witnessed claimant providing a urine specimen at 9:18 a.m. on August 5, 1992.

9. The temperature of the specimen was taken and it was found to be slightly high and the Medical Review Officer requested that claimant provide another urine specimen.

10. At 11:10 a.m. on August 5, 1992, the Medical Review Officer again witnessed claimant providing a urine specimen.

11. Both specimens were sent to the laboratory for testing.

12. When claimant went to his drug counseling session on the evening of August 5, 1992, claimant provided a specimen to the rehabilitation facility for drug testing.

13. The results of the 9:18 a.m. drug test were allegedly negative.

14. The results of the 11:10 a.m. drug test were allegedly positive for cocaine.

15. Claimant was notified that the results of the drug test that he had taken at his counseling session at the rehabilitation facility were allegedly negative.

16. Employer discharged claimant for violation of employer's drug abuse policy.

17. Claimant has not used cocaine since early in June 1992, before beginning his rehabilitation program (sic) the end of June.

(R.R. 125a–126a).

■ On appeal to this court, Philadelphia Gas Works presents one issue for our consideration.[6] The issue presented is whether the Board erred in ignoring overwhelming, competent evidence that Johnson violated Philadelphia Gas Work's policy against drug use which constituted willful misconduct. Essentially, the issue is one of whether substantial evidence existed to support the determination of the Board.

■ It is established that, in unemployment compensation cases, the Board is the ultimate finder of fact and findings of fact made by the Board are conclusive on appeal as long as they are supported by substantial evidence. *Peak; Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 378 A.2d 829 (1977). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 501 A.2d 1383 (1985); *Wittco Fashions v. Workmen's Compensation Appeal Board (O'Neil),* 118 Pa.Commonwealth Ct. 126, 544 A.2d 559 (1988). Although the Board is the ultimate factfinder, the Board cannot ignore overwhelming evidence in favor of a contrary result which is not supported by the evidence. *Borello v. Unemployment Compensation Board of Review,* 490 Pa. 607, 417 A.2d 205 (1980).

■ In unemployment compensation cases, the burden is on the employer to establish that an employee was discharged

---

6. Our review is limited to determining whether constitutional rights have been violated, an error of law has been committed or whether necessary findings of fact are supported by substantial evidence. *Baertl v. Unemployment Compensation Board of Review,* 156 Pa.Commonwealth Ct. 428, 627 A.2d 1232 (1993).

for willful misconduct. *Giglio v. Unemployment Compensation Board of Review*, 126 Pa.Commonwealth Ct. 471, 560 A.2d 271 (1989). Whether an employee's actions constitute willful misconduct is a question of law fully reviewable by this court. *New v. Unemployment Compensation Board of Review*, 126 Pa.Commonwealth Ct. 52, 558 A.2d 602 (1989), *appeal denied*, 527 Pa. 613, 590 A.2d 298 (1991).

Although not statutorily defined, willful misconduct has been defined by appellate courts as a wanton or willful disregard of the employer's interest, a deliberate violation of the employer's work rules, a disregard of the standard of behavior which an employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interest or of the employee's duties and obligations to the employer. *Knarr v. Unemployment Compensation Board of Review*, 134 Pa.Commonwealth Ct. 613, 579 A.2d 464 (1990).

■ We are not unmindful that the Board, herein, found Johnson's testimony that he has not used cocaine since he began his rehabilitation program at the end of June to be credible. However, the Board, in finding Johnson's testimony to be credible in this regard did not reject Dr. Barlow's testimony nor did Johnson dispute Dr. Barlow's testimony; as noted hereinabove, Johnson merely stated that he did not "believe" the urine sample which resulted in a positive drug test was his. Significantly, the Board did not make any findings that the urine sample tested by Dr. Barlow was not Johnson's, as was Johnson's stated belief. To the contrary, as noted, the Board merely found, in finding of fact 17, that Johnson "has not used cocaine since early in June 1992." [7] However, the overwhelming and undisputed evidence presented by Philadelphia Gas Works, herein, demonstrates otherwise. The Board ignored this evidence and made a determination which was not supported by substantial evidence but was merely based upon its credibility determination in favor of Johnson. This Court has never permitted a Board's credibility determination, where not supported by the evidence, to be used to grant benefits where none would otherwise be granted under the law.

The evidence presented by Philadelphia Gas Works clearly indicated a violation of its drug policy by Johnson. Such evidence consisted of a laboratory report revealing the positive test result for cocaine and the testimony of Dr. Barlow, which, as noted, was not disputed by Johnson or discredited by the Board.

Dr. Barlow testified that he is involved in drug testing and collection procedures for Philadelphia Gas Works, that he is familiar with the random selection drug testing, that Johnson's urine sample was processed pursuant to federal regulations and employer policy, that, at Johnson's request, the sample was retested by a laboratory of Johnson's choice, that a witness was present at the time Johnson gave the sample, and that the chain of custody documentation was in order.

Specifically, Dr. Barlow testified that:

The requirements for every test that is done is that after a test is produced or a specimen is produced, the temperature of that specimen must be taken. And it must be within a very specific range or else it's considered unacceptable and considered by the Department of Transportation to be an adulterated specimen of some sort. And the law specifically requires that if that situation occurred, the temperature is out of the range that is considered normal, which is 90.5 degrees fahrenheit, which is quite low, to 99.8 degrees, which is even above normal body temperature that specimen—outside of that range that specimen is unacceptable. However, the individual is given ... the opportunity to provide an oral temperature to determine if there was an explanation of a very high fever, for example, led to this unusual temperature. That was done, that oral temperature was taken on two occasions, and the highest of those two was 98.1 degrees. And the minimum temperature of the specimen was 100 degrees.... In fact, it's believed it was significantly higher....

---

7. Also significant is that the Board found, in finding of fact 10, that "[a]t 11:10 a.m. on August

5, 1992, the Medical Review Officer again witnessed claimant providing a urine specimen."

That's why the government said, "Let's check the temperature"; because the only other explanation would be if someone had a very high fever. That urine should be roughly the same temperature as the internal body temperature.... If there's more than a certain differential, it's to be considered the potential for adulteration. (R.R. at 66a–67a).

Dr. Barlow testified that the temperature of Johnson's specimen was over 100 degrees and went up on the temperature strip immediately, though it usually takes a few seconds for that to develop. Dr. Barlow further indicated that they tried two different thermometers to give Johnson the benefit of the doubt about his actual body temperature. When questioned as to whether there was any reason for the urine sample to be higher than the body temperature, Dr. Barlow stated it was "medically impossible". (See R.R. at 68a). Finally, when questioned about his professional opinion regarding Johnson's urine test, Dr. Barlow testified that it was his opinion that there was cocaine in the urine specimen that was taken at 11:10 a.m. on August 5, 1992. (R.R. at 73a). Such undisputed evidence demonstrates a violation of Employer's drug policy.

The previous finding by the referee that Johnson tested positive for cocaine use and the referee's determination that such behavior constituted willful misconduct were supported by substantial evidence of record. The Board's reversal of such determination was not so supported and was, therefore, in error.

Accordingly, on the basis of the foregoing, the order of the Board granting benefits to Johnson is reversed.

### ORDER

AND NOW, this 13th day of January, 1995, the order of the Unemployment Compensation Board of Review dated April 19, 1994 is reversed.